**James VIGGIANO, Anthony Conti, Anthony Smiley, for themselves and all persons similarly situated, Plaintiffs,**

v.

**SHENANGO CHINA DIVISION OF ANCHOR HOCKING CORPORATION, Defendant.**

**Civ. A. No. 83–1064.**

United States District Court,
W.D. Pennsylvania,
Pittsburgh Division.

Nov. 1, 1983.

William T. Payne, Asst. Gen. Counsel, United Steelworkers of America, Pittsburgh, Pa., for plaintiffs.

Henry J. Wallace, Jr., Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for defendant.

## OPINION

SIMMONS, District Judge.

The plaintiffs in this case are employees of Shenango China Division of Anchor Hocking Corporation (Shenango), employed at its New Castle, Pennsylvania facility where dishware is manufactured. The plaintiffs are participants in the Anchor Hocking Corporation Group Insurance Plan for Hourly Employees (Group Insurance Plan) established by an agreement between Shenango and the plaintiffs' collective bargaining representative, the United Steelworkers Union of America (Steelworkers Union). The Steelworkers Union represents approximately 700 employees at the New Castle facility of Shenango.

The salient facts in this case are undisputed. Since 1940 Shenango has recognized the Steelworkers Union as the exclusive bargaining representative for the company's production and maintenance employees and its group leaders. Over this period of time, Shenango and the Steelworkers Union have negotiated a series of collective bargaining agreements, including pension and insurance plans. On March 1, 1980, Shenango and the Steelworkers Union entered into a collective bargaining agreement which is the subject matter of the instant dispute. The 1980 labor agreement between the Steelworkers Union and Shenango continued in effect an existing pension agreement and insurance program which by its terms expired midnight, February 28, 1983. The existing insurance plan contained a "coverage during-strike" clause which provided that employees' insurance coverage under the plan would continue for six months after the last day worked, if the employees were absent from active work because of a strike. The labor agreement also provided that either party, upon proper notice, had the right to renegotiate the terms and conditions of the insurance and pension agreements. If the parties failed to reach an agreement on these matters by February 28, 1983, the agreement gave the Union the right to strike in support of its position. Otherwise, the 1980 collective bargaining agreement contained a broad "no-strike" clause which prevented strike action by the Union. In essence, the no-strike clause prohibited any form of work stoppage, including strikes, during the life of the agreement. Any employee who engaged in a strike, during the duration of the agreement was subject to being discharged.

On December 14, 1982, the Steelworkers Union notified Shenango of its desire to terminate the 1980 collective bargaining agreement then in effect and to negotiate a new agreement. Thereafter, Shenango and the Steelworkers Union met and engaged in collective bargaining. After having failed to reach a new agreement on

March 1, 1983, the Steelworkers Union exercised its right to strike.

During a February 28, 1983 negotiation meeting, just one day prior to the strike deadline, Shenango informed the Steelworkers Union that the employees' insurance coverage would cease if the employees went on a lawful strike, and over the Steelworkers Union protest, Shenango asserted that all insurance benefits ceased upon the expiration of the 1980 collective bargaining agreement. Although the Steelworkers Union argued that under the "coverage-during-strike" provision of the Group Insurance Plan, Shenango was required to continue insurance premiums for a period of six months following the date of the lawful strike, Shenango stopped paying the premiums on March 1, 1983. In addition, Shenango informed hospitals and other health care providers that its employees' insurance coverage had been discontinued.

The lawful strike of the Steelworkers Union at Shenango's New Castle facility ended when Shenango and the Steelworkers Union reached a new collective bargaining agreement on March 27, 1983. The new agreement, by its terms, expires March 26, 1986. During the strike settlement negotiations Shenango refused to pay back-premiums for the 700 employees in the collective bargaining unit, but instead agreed to pay individual conversion rates for employees who actually received medical treatment and incurred medical expenses during the 27-day strike period and could not financially afford to pay the conversion rate themselves. The Group Insurance Plan, under the 1980 collective bargaining agreement, contains a 90-day conversion period during which employees insurance coverage continues in effect if premiums are paid at a higher individual rate at any time within 90 days after Shenango's group policy was discontinued.

During the strike period approximately 35 employees received medical treatment. Shenango paid each employee an amount equivalent to their individual conversion rate, or if their medical expenses were less

than their conversion rate, Shenango paid the actual medical expense.

After Shenango refused to pay back-premiums for all 700 employees of the collective bargaining unit during the 27-day strike period, the Steelworkers Union brought this action on behalf of all plan participants. The Union alleged that by ceasing to pay premiums for group insurance after the collective bargaining agreement had terminated and the Union went on a lawful strike, Shenango violated specific provisions of the Group Insurance Plan and the Employee Retirement Income Security Act, § 502, 29 U.S.C. § 1132 *et seq.* (1974) (ERISA). Believing that it is entitled to judgment as a matter of law on the undisputed facts, the Steelworkers Union moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

Shenango filed no opposition to the Steelworkers Union's motion for summary judgment. Instead, Shenango filed a cross-motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure. Shenango alleged that the Steelworkers Union had failed to exhaust the mandatory procedure for resolution of disputes as required by the collective bargaining agreement between the parties. Arbitration, Shenango asserted, is a pre-requisite to federal court jurisdiction under section 502 of ERISA. Second, Shenango argued, the dispute is not justiciable because the employees suffered no economic damage and the strike settlement agreement between Shenango and the Steelworkers Union constituted a full accord and satisfaction of the claims herein.

A. THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT IS GRANTED.

1. THE UNDISPUTED FACTS WARRANT JUDGMENT AS A MATTER OF LAW IN THE PLAINTIFFS' FAVOR REGARDING SHENANGO'S ALLEGED VIOLATION OF THE GROUP INSURANCE PLAN.

The question presented by the Steelworkers Union's motion for summary judgment regarding Shenango's alleged violation of

the Group Insurance Plan is solely one of law. Since no material, disputed issue of fact is raised on the record, this question is ripe for summary disposition under Rule 56 of the Federal Rules of Civil Procedure.

As noted earlier, the plaintiffs in this action are participants in the Group Insurance Plan which provides health insurance benefits to Shenango's employees. The 1980 collective bargaining agreement between Shenango and the Steelworkers Union incorporates, as an employee benefit, the Group Insurance Plan, which contains the following clause:

**Absence From Active Work**

If you are on special leave of absence, vacation, sick leave, regular leave of absence or layoff, or if you are *absent because of a strike* or lockout of employees of the company, your coverage under the Plan and the coverage of your dependants, if any, will continue in accordance with the following:

. . . .

2. If you are on regular leave of absence or layoff, or *if you are absent because of a strike* or lockout of employees of the company, *your coverage will terminate six months after your last day worked.*

*See* Group Insurance Plan, Complaint Exhibit A, at 8. (emphasis added).

The Steelworkers Union alleges that Shenango's termination of their insurance coverage on March 1, 1983, violated the specific terms of the Group Insurance Plan and therefore violates the collective bargaining agreement which gives rise to a civil action under ERISA.

Shenango's obligation to maintain an insurance program, as set forth in Article IX of the 1980 collective bargaining agreement, expires on February 28, 1983 at midnight. Shenango argues that on March 1, 1983, when the parties were unable to reach new agreements and the Union struck in support of its position, the 1980 agreement expired. Simply, Shenango's position is that the Group Insurance Plan also terminated when the parties mutually agreed to terminate the underlying agree-

ment and the Union went on strike. To this end, Shenango notes that the insurance booklet specifically states that insurance coverage ends "when the group contracts are discontinued." Shenango reasons that its obligation to maintain insurance coverage under the collective bargaining agreement does not extend beyond the expiration of the agreement itself, therefore, its failure to pay premiums after the agreement expired was justified.

Shenango's reasoning, however, is unpersuasive. The collective bargaining agreement contains a broad no-strike clause which prohibits strikes during the duration of the agreement. Strikes occurring while the labor agreement is in effect are violative of the no-strike clause and are therefore unlawful. An unlawful strike would entitle Shenango to injunctive relief, *Boys Markets, Inc. v. Retail Clerks Union,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), damages against the Union, *Atkinson v. Sinclair Refining Company,* 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962), and subject the employees to termination under Article II, section 2 of the collective bargaining agreement. Moreover, the Group Insurance Plan itself provides that upon termination of employment, employees' insurance coverage will cease immediately.

The only exception to the broad no-strike clause in the collective bargaining agreement appears in Article XIX, section 2. This section permits the employees to strike if the Steelworkers Union and Shenango fail to renegotiate a new contract by midnight February 28, 1983, when the agreement was scheduled to expire. Since strikes occurring during the duration of the agreement are expressly prohibited, the six-months "coverage-during-strike" clause in the Group Insurance Plan, as a practical matter, becomes operative only after the collective bargaining agreement has expired and the employees are permitted to strike. Any interpretation to the contrary would effectively read the "coverage-during-strike" clause out of the insurance plan.

Not only is Shenango's reading of the "coverage-during-strike" clause inconsistent with the no-strike provision of the collective bargaining agreement, but it also flies in the face of logic. Logic dictates that this Court should reject Shenango's position that the "coverage-during-strike" clause is only operative while the labor agreement is in effect. First, it cannot be seriously contended that the parties contemplated the possibility of a lawful strike in violation of the terms of the no-strike clause of the labor agreement, especially one lasting for six months in duration while the labor agreement is still in effect. Given the availability of injunctive relief, such a strike would be unlawful and undoubtedly it would be very brief. In consequence, employees would be subject to termination and a loss of their insurance benefits. Second, a "coverage-during-strike" clause only benefits the employees if it applies to lawful strikes occurring after the termination of the collective bargaining agreement. Under the 1980 labor agreement between Shenango and the Steelworkers Union, Shenango's interpretation of the "coverage-during-strike" clause renders its agreement to furnish insurance protection to its employees during a strike meaningless.

Additionally, Shenango's interpretation of the Group Insurance Plan ignores the fact that the parties can create lawful contractual rights which extend beyond the expiration of the agreement. For example, pensions benefits or agreements to pay health insurance benefits may extend beyond the expiration of an agreement. *See, e.g., United Steelworkers of America v. Fort Pitt Steel Casting,* 598 F.2d 1273 (3d Cir.1979).

■ Therefore, it is clear on the undisputed facts that Shenango violated the specific terms of the collective bargaining agreement when it terminated the employees' insurance premiums in the face of the six-months insurance coverage provision in the Group Insurance Plan. This conclusion is buttressed by the history of the parties own interpretation and application of the "coverage-during-strike" clause during previous strikes. It is undisputed in the record that in 1974 and 1977 strikes occurred while the same "coverage-during-strike" provision was in effect in prior insurance plans. At those times, Shenango did not terminate the employees insurance premiums, but continued coverage and accepted claims for benefits presented by its employees.

The parties past conduct and the application of the disputed clause verifies the foregoing interpretation of the labor agreement. To this end, Corbin has noted that:

> [i]n the process of interpretation of the terms of a contract, the court can frequently get great assistance from the interpreting statements made by the parties themselves or from their conduct in rendering or receiving performance under it .... The process of practical interpretation and application ... is merely a further expression by the parties of the meaning that they give to the terms of their contract previously made. There is no good reason why the court should not give great weight to these further expressions by the parties. [E]vidence of practical interpretation and construction by the parties is admissible to aid in choosing the meaning to which legal effect will be given.

1 Corbin on Contracts, § 543 (1952).

At the argument on the parties' cross-motions, Shenango stated that it did not file a response to the Steelworkers Union's motion for summary judgment because it believed that its affidavits filed in support of its motion to dismiss raised genuine disputed issues of fact. In short, Shenango asserts in its responsive pleadings and again in its motion to dismiss that when the parties reached a strike settlement on March 27, 1983, Shenango agreed to pay the cost of the insurance coverage during the strike period only for those employees who incurred medical expenses. This agreement, Shenango argues, constitutes a full accord and satisfaction of the claim herein disputed. However, the affidavit Shenango relies on as raising disputed issues of fact is completely devoid of any

factual allegations, contested or otherwise, to support its theory that the parties reached a full settlement of the claim herein asserted.

It is widely recognized that Rule 56 should be cautiously invoked to the end that parties may always be afforded a trial where there is a bona fide dispute of fact between them. It is not the function of the trial court to adjudicate genuine factual issues on a motion for summary judgment. All inferences of fact from affidavits proffered must be drawn against the movant and in favor of the opposing party. *Adickes v. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970). In other words, affidavits opposing the Union's motion must be indulgently treated and viewed in the light most favorable to Shenango to ascertain whether factual issues exist.

Aside from the elements necessary to establish an accord and satisfaction, Shenango's theory that the disputed claims were settled is wholly unsupported by its affidavits. In its sole affidavit at paragraph 6, Shenango's Manager of Industrial Relations avers that the company "agreed as part of the strike settlement to maintain coverage during the period of the 26-day [sic] strike." Construed in the light most favorable to Shenango, this averment, standing alone, hardly raises a genuine, disputed issue of fact regarding an alleged settlement of the disputed insurance claim. There are no other statements which could be liberally construed as raising the issue of a full and complete settlement as alleged in Shenango's pleadings and motion.

Nowhere in its affidavit is it asserted that the parties agreed that payment by Shenango of the claims occurring during the strike period was in full satisfaction of the disputed right to "coverage-during-strike" for the entire collective bargaining unit; nor an intention on the part of both parties to compromise the dispute; nor that such an intent was communicated to the other party, either orally or in writing. In sum, Shenango raises no disputed, factual allegations in its affidavit.

Nor does Shenango's affidavit controvert the Steelworkers Union affidavits. The Steelworkers Union contends that Shenango's payment of the employees insurance claim which were incurred during the strike period was not a quid pro quo, nor did it constitute a settlement of the dispute regarding Shenango's obligation to continue the employees' insurance premiums during the strike period. This contention, repeatedly raised in the Steelworkers Union's affidavits, is uncontroverted by Shenango's affidavit. Moreover, in a letter dated March 28, 1983, only one day after the strike ended, the Steelworkers Union reduced to writing the essence of their agreement with Shenango in regards to the disputed insurance provision. In that letter, the Union noted that notwithstanding the resolution of the strike it "will continue to assert the employees' well-established rights to [insurance] coverage while on strike and will pursue the remedy of reimbursement for premiums while on strike." In addition, the Steelworkers Union avers that it has repeatedly denied Shenango's request that the Steelworkers not pursue the claim asserted herein.

Although the allegations raised in the Steelworkers Union affidavits are inconsistent with Shenango's theory that the Union's claim has been heretofore settled, Shenango's affidavits do not controvert any of the Union's factual allegations. Therefore, on this record, since Shenango has raised no genuine disputed issue of fact regarding the alleged settlement and the Steelworkers Union has established by credible evidence that on the undisputed facts and law it is entitled to judgment, summary judgment is hereby granted to the plaintiffs because of Shenango's clear violation of the Group Insurance Plan of the collective bargaining agreement.

2. BY TERMINATING THE INSURANCE COVERAGE OF ITS EMPLOYEES IN VIOLATION OF THE GROUP INSURANCE PLAN, SHENANGO ALSO VIOLATED ITS FIDUCIARY DUTY UNDER ERISA.

Also, the Steelworkers Union contends that Shenango breached the high standards

imposed by ERISA on a fiduciary when it terminated the employees' group insurance coverage during the 27-day strike. Further, the Union avers that Shenango profited by terminating the employees benefits and should be required to disgorge the profits it realized by breaching its fiduciary duty.

It is undisputed that Shenango as a plan administrator is a "fiduciary" within the meaning of ERISA. To be sure, Shenango's Group Insurance Plan states that "[t]he people who operate your Plan, called 'fiduciaries' of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries."

Under ERISA a fiduciary is required to "discharge his duties with respect to a plan solely in the interest of the participants" and "for the exclusive purpose of ... providing benefits to participants...." Employee Income Retirement Income Security Act, § 404, 29 U.S.C. § 1104(a)(1)(A) (1974). Moreover, a fiduciary may not "deal with the assets of the plan in his own interest or for his own account." *Id.* at § 1106(b)(1). For breaches of the fiduciary duty imposed by ERISA, plan administrators are required "to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary...." *Id.* at § 1109(a). It has been generally held that these provisions impose a stringent duty of loyalty upon an employer-fiduciary. *See generally NLRB v. Amax Coal Co.,* 453 U.S. 322, 329–30, 101 S.Ct. 2789, 2794, 69 L.Ed.2d 672 (1981).

■ The crux of the Steelworkers Union's theory that Shenango violated its fiduciary responsibility under ERISA is that Shenango allegedly furthered its collective bargaining interest, rather than the interest of the plan participants, when it cut off the employees' insurance benefits. In this regard the Union contends that Shenango used the "termination of benefits as a bludgeon to pressure employees and to attempt to gain leverage in negotiations." On the undisputed facts, it is clear that Shenango violated the high fiduciary standards imposed upon it by ERISA when it terminated

its employees' insurance coverage. In short, during the contract negotiations Shenango informed the Union that it would terminate the employees insurance benefits if the contract expired and the employees went on strike. Contrary to the explicit language of the "coverage-during-strike" provision of the Group Insurance Plan, Shenango carried out its intimidation. Shenango's actions were not only contrary to the specific terms of the Plan, but were also not solely in the interest of the plan participants nor for their exclusive benefit, as required by a fiduciary. For these reasons, Shenango's actions amounted to a breach of their fiduciary duty under ERISA, thus, Shenango shall be required to pay into the Plan any savings which were effected by virtue of its breach of trust.

## B. THE DEFENDANT'S MOTION TO DISMISS IS DENIED.

THE COLLECTIVE BARGAINING AGREEMENT BETWEEN THE PARTIES DOES NOT REQUIRE THAT THE DISPUTE WHICH THE PLAINTIFFS SEEK TO ADJUDICATE BEFORE THIS COURT BE SUBJECT TO COMPULSORY, FINAL AND BINDING ARBITRATION.

The 1980 labor agreement between the Steelworkers Union and Shenango contains in Article IX a grievance provision which culminates, if necessary, in final and binding arbitration. Under this provision of the labor agreement grievances are defined as "points of contention between the company and the union concerning ... wages, working conditions, contract interpretation and application, treatment of employees and apprenticeship."

Shenango contends that the dispute concerning its obligation to continue insurance benefits while its employees are on strike is a mandatory subject for arbitration because it involves the meaning and application of the insurance program established under Article XII of the collective bargaining agreement. Specifically, Shenango argues that the grievance procedure set forth

in the 1980 collective bargaining agreement is precisely the type of claims procedure contemplated by ERISA. Since the Group Insurance Plan is incorporated in the labor agreement by reference, under Shenango's reasoning, the dispute regarding the "coverage-during-strike" clause is subject to mandatory arbitration.

The Group Insurance Plan established by Shenango is undisputably subject to the provisions of ERISA. Section 503 of ERISA requires that every employee benefit plan contain a procedure to afford the employees a reasonable opportunity for a full and fair review of his claim, should the employee be denied a benefit which is allegedly due him. 29 U.S.C. § 1133(2). Additionally, Department of Labor regulations implementing Section 503 of ERISA, require that employee benefit plans be "written in a manner calculated to be understood by the average plan participant and shall be sufficiently comprehensive to apprise the plan participants and beneficiaries of their rights and obligations under the plan." *See* Reporting and Disclosure Under the Employee Retirement Insurance Security Act of 1974, 29 C.F.R. § 2520.-102(a) (1977).

The foregoing section of the labor regulations generally sets forth the minimum requirements for employee benefit procedures pertaining to claims by participants. Shenango argues that the parties' collective bargaining agreement sets forth a grievance and arbitration procedure as contemplated by ERISA regulations. However, Shenango's argument that its Group Insurance Plan is subject to the mandatory grievance procedure set forth in the collective bargaining agreement is fatally flawed in several respects.

First, it should be noted that the labor regulations provides, in part, that:

(2) In the case of a plan established and maintained pursuant to a collective bargaining agreement . . .:

(i) such plan will be deemed to comply with the provisions of . . . this section if the collective bargaining agreement pursuant to which the plan is established or maintained sets forth or incorporates by specific reference. (A) Provisions concerning the filing of benefits claims and the initial disposition of claims, and (B) A grievance and arbitration procedure to which claims denied are subject.

29 C.F.R. § 2560.503–1. Unlike the ERISA requirements, the 1980 collective bargaining agreement between Shenango and the Steelworkers Union does not incorporate by specific reference a grievance and arbitration procedure to which denied insurance benefits are subject; nor does the Group Insurance Plan incorporate by specific reference a grievance and arbitration procedure in the collective bargaining agreement to which denied insurance benefits are subject. Hence, Shenango's reliance on Article IX-Settlement of Grievance clause in the collective bargaining agreement is misplaced.

Although the collective bargaining agreement contains an arbitration procedure, there is absolutely no references to a grievance and arbitration procedure for denied insurance benefits under the Group Insurance Plan. In fact, the collective bargaining agreement narrowly defines grievances as "points of contention" regarding only "wages, working conditions, contract interpretation and application, treatment of employees and apprenticeship." Nowhere in the collective bargaining agreement is any reference made to a mandatory grievance procedure for denied insurance benefits.

Second, the explicit language of the Group Insurance Plan belies Shenango's assertion that disputed insurance benefits are subject to mandatory arbitration in accordance with the procedure outlined in the collective bargaining agreement. The Group Insurance Plan provides, in part, that:

Blue Cross and Blue Shield have agreed to undertake the claims responsibility required under the Employee Retirement Income Security Act of 1974 (ERISA). Accordingly, if, under this program of health care benefits, an employee has had a claim for such benefits denied, he

may request in writing a full review of that denial .... Upon completion of the review by Blue Cross or Blue Shield, the employee will be advised, in writing, *of the final disposition of the claim.*

*See* Group Insurance Plan, Complaint Exhibit A, at 4. (emphasis added). Under paragraph 7 of the following provision, the Group Insurance Plan states that "[i]f you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court." *Id.* at 5. In short, the plain language of the insurance plan clearly refutes Shenango's assertion that denied insurance benefits are subject to mandatory, final and binding arbitration. Furthermore, the plan specifically states that its claim procedure is required by ERISA.

It is clear that the mechanism for resolution of insurance disputes outlined in the Group Insurance Plan is wholly independent of the grievance and arbitration procedure outlined in the collective bargaining agreement. The labor agreement's general arbitration clause does not specifically or inferentially refer to or attempt to incorporate by reference disputes arising from the Group Insurance Plan. The Group Insurance Plan is devoid of any duty to arbitrate insurance benefit disputes growing out of the contract. Because there is no duty to arbitrate a non-arbitrable issue and because the plan itself specifically grants the participants the right to file suit in a Federal Court under the above recited circumstances, Shenango's motion to dismiss must be and is hereby denied.

### ORDER

AND NOW, to wit, this 1st day of November 1983, after argument, consideration of the briefs and for the reasons set forth in the accompanying opinion, IT IS HEREBY ORDERED that:

a. The Motion For Summary Judgment of James Viggiano, Anthony Conti and Anthony Smiley be and the same is hereby GRANTED;

b. The Motion To Dismiss of Shenango China Division of Anchor Hocking Corporation be and the same is hereby DENIED.

IT IS FURTHER ORDERED AND DECREED that:

1. Under the terms of the collective bargaining agreement between Shenango China Division of Anchor Hocking Corporation and the United Steelworkers Union of America, in effect from March 1, 1980, through February 28, 1983, participants in the Anchor Hocking Corporation Group Insurance Plan for Hourly Employees were entitled to insurance coverage during the lawful strike occurring February 28, 1983, and ending March 27, 1983, and Shenango must reimburse the Plan in an amount equal to the money savings which were effected by virtue of Shenango's breach of trust.

2. The "Absence From Active Work" provision of the Group Insurance Plan shall be interpreted as requiring Shenango China to provide six months insurance coverage for all eligible employees during lawful strikes occurring upon the expiration of a collective bargaining agreement between the parties hereto, so long as said clause shall exist in the Group Insurance Plan.

3. Shenango China is hereby permanently enjoined and restrained from ceasing to provide insurance coverage under the terms of the Group Insurance Plan for all eligible plan participants during a lawful strike occurring upon the expiration of the collective bargaining agreement and continuing for six months thereafter, so long as said clause shall exist in the Group Insurance Plan.

4. It appearing to the Court that no employee suffered a loss of insurance coverage due to the 90-day conversion period, and no employee suffered a loss of insurance benefits because Shenango paid the individual conversion rate or actual medical expense for employees receiving medical treatment, exemplary damages are inappropriate and are hereby DENIED to the Plaintiffs.

5. It appearing to the Court that Shenango China violated the express provi-

sions of the Group Insurance Plan and violated its fiduciary duty under ERISA, although no employee suffered direct pecuniary damages, nominal damages of one dollar, costs and reasonable attorney fees will be GRANTED to the Plaintiffs and the parties shall appear at a hearing before this Court on the 1st day of December, 1983 in Court Room 5 of the United States Court House, Pittsburgh, Pennsylvania, for the purpose of determining the amount of attorney fees to be awarded the Plaintiffs. It is hereby ordered that plaintiffs' attorneys shall submit a petition in support of their request for attorneys fees on or before November 21, 1983.