750 F.2d 276
 118 L.R.R.M. (BNA) 2124, 102 Lab.Cas. P 11,284,
5 Employee Benefits Ca 2481
 James VIGGIANO, Anthony Conti, Anthony Smiley, for
themselves and all persons similarly situated,
Appellants in 84-3075,
v.
SHENANGO CHINA DIVISION OF ANCHOR HOCKING CORPORATION,
Appellant in 84-3059.
 Nos. 84-3059, 84-3075.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 3, 1984.
Decided Dec. 19, 1984.
 
 Henry J. Wallace, Jr. (argued), Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for appellant Shenango China Div.
 William T. Payne, (argued), Daniel P. McIntyre, United Steelworkers of America, Pittsburgh, Pa., for appellees Viggiano, Conti, and Smiley.
 Before ALDISERT, Chief Judge, HUNTER and WEIS, Circuit Judges.
 OPINION OF THE COURT
 WEIS, Circuit Judge.
 
 
 1
 The dispute in this case is whether an employer was required to continue payment of premiums for a group hospitalization plan for its employees during a strike. Because the employer's obligation to fund the Plan had its roots in the collective bargaining agreement, we conclude that the parties should resort to its grievance procedures in the first instance rather than ERISA's judicial remedies. For that reason we will vacate the district court's summary judgment on the merits, 574 F.Supp. 861, and remand for the entry of a stay.
 
 
 2
 Alleging violations of fiduciary duties, plaintiffs brought this suit under Section 502 of the Employee Retirement Income Security Act of 1974, 29 U.S.C. Sec. 1132 (1982), against their employer, Shenango China Division of Anchor Hocking Corporation. The district court granted the plaintiffs' motion for summary judgment and denied the defendant employer's motion for dismissal under Fed.R.Civ.P. 12(b)(1). Both parties have appealed.
 
 
 3
 The controversy is about the employer's unilateral termination of the hospital and surgical benefits insurance Plan for employees and their dependents. The insurance program, negotiated by the company and the United Steelworkers Union representing the employees, is mentioned in the labor agreement but not in detail. A provision for continuation of the Plan and funding by the employer was included in the collective bargaining agreement effective for a three-year period beginning March 1, 1980. A similar clause had appeared in several earlier contracts.
 
 
 4
 When the union went on strike at the termination of the contract on February 28, 1983, the company stated it would no longer make payments to Blue Cross/Blue Shield, which had administered the insurance Plan. The company also notified health care providers in the New Castle, Pennsylvania area, where the plant was located, that the insurance program for its employees had been discontinued.
 
 
 5
 The strike was settled about four weeks later, on March 27, 1983, when the union and the company agreed on a new contract. During the strike, some union members or their dependents had received medical or hospital services. As part of the strike settlement, the company agreed to pay either the premiums for interim coverage for those persons who had been treated, or the actual amount of their bills, whichever was less.[1] Consequently, no employee suffered any financial loss because of the company's short-lived refusal to continue the medical insurance Plan.
 
 
 6
 This suit was filed about five weeks after the strike was settled. Plaintiffs brought the action on behalf of all employees eligible for coverage under the Plan. They alleged that the company's refusal to continue insurance coverage during the strike caused them to suffer anxiety and hardship, and would do so in the future. The complaint asserted the company had violated provisions in the insurance Plan which stated that if participants "are absent because of a strike or lockout of employees of the company, your coverage ... will continue ... [but] will terminate six months after your last day worked."[2]
 
 
 7
 Plaintiffs contended that the company violated its fiduciary duties under ERISA by terminating the insurance to gain leverage during contract negotiations and limit financial obligations under the Plan. Injunctive relief against future denials of coverage was requested, as were compensatory and punitive damages.
 
 
 8
 The employer asserted that its obligation to pay premiums was governed by the collective bargaining agreement, which provided that "the agreements of the parties ... including the ... insurance program presently in effect ... shall continue in effect to and including midnight of February 28, 1983." Shenango also pointed out that the Plan booklet contained a provision stating that the insurance coverage ends "when the group contracts are discontinued." The company contended, however, that the suit should be dismissed because plaintiffs had failed to submit the dispute to arbitration as provided in the collective bargaining agreement.
 
 
 9
 The district court noted that the grievance procedures applied to disputes defined as "points of contention" regarding "wages, working conditions, contract interpretation and application." However, in the court's view, those provisions did not include controversies about employees "denied insurance benefits" under the Plan. The court observed that under the terms in the Plan booklet an employee could submit a claim for denial of benefits to Blue Cross as well as file suit in a state or federal court. Having determined that the employer's action did not come within the scope of the grievance provisions, the court denied the company's motion to dismiss.
 
 
 10
 The court concluded that "it is clear on the undisputed facts that Shenango violated the specific terms of the collective bargaining agreement when it terminated the employees' insurance premiums in the face of the six-months insurance coverage provision in the Group Insurance Plan." The employer was also found to have violated its fiduciary duty under ERISA because the termination was "not solely in the interest of the plan participants nor for their exclusive benefit, as required by a fiduciary."
 
 
 11
 The court rejected the plaintiffs' contention that the company had been unjustly enriched and denied the request for punitive damages. The court entered judgment against defendant for nominal damages and attorneys' fees.
 
 
 12
 On appeal, the employer contends that plaintiffs are required to exhaust the remedies set out in the Plan booklet and the grievance procedures in the collective bargaining agreement. Plaintiffs maintain that Shenango reaped a profit through a breach of fiduciary duty[3] and should be required to restore that amount to the Plan. They also contend that punitive damages should have been awarded as a deterrent.
 
 
 13
 These appeals raise substantial questions about the relationship between the judicial remedies provided by ERISA and the arbitration favored by general principles of labor law. ERISA provides for immediate access to the federal courts without resort to the labor arbitration forum in proper circumstances. See Schneider Moving & Storage Co. v. Robbins, --- U.S. ----, 104 S.Ct. 1844, 80 L.Ed.2d 366 (1984). But that result does not automatically follow in each instance where there is a controversy over some phase of employee welfare benefit plan as defined by ERISA. Resort to arbitration may still be appropriate where the parties contest the meaning of a term in a collective bargaining agreement.
 
 
 14
 Whether the resolution of a controversy should proceed under ERISA or under a labor contract is not always clear, and in the nature of things, at times, there is an overlap. It is helpful, therefore, to put the current dispute in context.
 
 
 15
 As the district court noted, because all medical expenses incurred during the strike were covered by the terms of the settlement, no individual plaintiff or employee suffered any monetary loss. Moreover, although individual employees are named as plaintiffs, it is apparent that the union is the actual party in interest. The district court recognized the realities of the situation and in its opinion on several occasions referred to the "Steelworker Union's motion for summary judgment" and noted what the "Steelworker's Union alleges" or "contends."
 
 
 16
 Convinced that the company improperly used the hospitalization insurance issue as a bargaining tool during the strike, the union seeks an injunction to avoid a reoccurrence. To solidify its position, the union also wishes to penalize the company through punitive damages and by requiring "disagreement" to the Plan. A substantial part of the union's argument rests on the company's payment of premiums during earlier strikes when the labor contracts contained the same provision in material aspects.
 
 
 17
 The employer, on the other hand, contends that its obligation to pay for insurance is limited to the duration of the collective bargaining agreement. In support of this contention, the employer refers to clauses in the labor contract and to language in the group insurance Plan booklet.
 
 
 18
 It is apparent that no controversy exists between the parties about the claim of any specific individual. Nor is there any dispute as to whether certain services are within the scope of the Plan, or whether certain persons are eligible for benefits. The question at issue is a limited one--when must the employer maintain coverage.[4]
 
 
 19
 To resolve the matter, we must decide whether the answer is to be found in the collective bargaining agreement or ERISA's provisions. As a preliminary observation, it is helpful to remember that ERISA's concern is with the elements of a plan and its administration after it has been established rather than to mandate the creation of a program. ERISA does not require an employer to establish a hospitalization plan nor continue it indefinitely.
 
 
 20
 In Sutton v. Weirton Steel Div. of National Steel Corp., 724 F.2d 406 (4th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984), the Court of Appeals held that an employer could terminate ancillary, nonvested benefits without violating ERISA. In refusing to continue payments, the employer did not breach any fiduciary duty, even though the company acted as administrator of its own pension plan. The court concluded that the provisions for benefits of this nature were to be found in the "pertinent employment agreements." Id. at 410. See also 1974 U.S.Code Cong. & Adm.News 4935, 5054.
 
 
 21
 Following that rationale, Shenango could bargain with the union to discontinue the hospitalization program in a forthcoming collective bargaining agreement without implicating ERISA's prohibitions. It is also true that a union can negotiate with an employer to continue medical insurance in effect beyond the expiration date of a collective bargaining contract. See United Steelworkers of America v. Fort Pitt Steel Casting, 598 F.2d 1273 (3d Cir.1979) (employer's refusal to comply with such a provision was an arbitrable matter under the union contract).
 
 
 22
 The attempt by the Steelworkers to eliminate a point of controversy from future negotiations through an ERISA adjudication is not inconsistent with its collective bargaining stance. The union argues that once a plan within the scope of ERISA comes into existence, disputes about its terms should be resolved through the statutory procedures. The employer contends just as vigorously that after the union terminated the collective bargaining agreement, no obligation to fund the insurance program remained.
 
 
 23
 The union points to the wording of the insurance Plan but the employer emphasizes the terminology in the labor contract signed on March 1, 1980. Whether the two agreements should be read together and whether the apparent inconsistencies can be reconciled are subjects both parties have studiously avoided. Those questions, however, go to the heart of the matter.
 
 
 24
 Essentially, the union seeks judicial disapproval of the employer's interpretation of the collective bargaining agreement. But the firmly established labor policy is that the courts should not decide such questions when the contract provides for another forum. United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); Adams v. Gould, Inc., 687 F.2d 27, 31 (3d Cir.1982), cert. denied, 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 348 (1983). The matter must be resolved through the arbitration required by the grievance provision. See Ft. Pitt Steel Casting, 598 F.2d 1273 (3d Cir.1979).
 
 
 25
 In concluding that the collective bargaining agreement did not govern, the district court took an unduly restrictive view of the grievance provisions, which included disputes about "contract interpretation." The company's position rests squarely on its interpretation of the collective bargaining agreement. The correctness of the employer's reading is reserved for arbitration, not for judicial decision. Although the right to insurance benefits under the Plan is an essential part of this case, the immediate question is the source of the obligation to fund those entitlements. Unless the collective bargaining agreement establishes a duty to maintain the program, ERISA does not come into play. Cf. Murphy v. Heppenstall Co., 635 F.2d 233 (3d Cir.1980), cert. denied, 454 U.S. 1142, 102 S.Ct. 999, 71 L.Ed.2d 293 (1982).
 
 
 26
 The reasoning of the Supreme Court in Schneider Moving & Storage Co. v. Robbins, --- U.S. ----, 104 S.Ct. 1844, 80 L.Ed.2d 366 (1984) supports requiring arbitration in this case. In Schneider, the Court decided that the trustees of multi-employer funds could seek judicial enforcement of trust conditions against a participating employer without first arbitrating the meaning of a term in the labor contract. The question was whether the employer properly applied the collective bargaining agreement in designating as "temporary," certain employees for whom no contributions were required. It was undisputed that the employer was required to contribute to the trust on behalf of regular employees.
 
 
 27
 The Court held that the presumption of arbitrability in labor disputes did not apply because the trustees were not parties to the collective bargaining agreement, and did not have available to them the economic weapons of strikes and lockouts. See also Struble v. New Jersey Brewery Employees' Welfare Trust Fund, 732 F.2d 325 (3d Cir.1984); Trustees of the Local 478 Trucking and Allied Industries Pension Fund v. Siemens Corp., 721 F.2d 451 (3d Cir.1983). Those critical considerations, however, do not apply where, as here, the union is a signatory to the contract and both parties have economic measures available to them. Indeed, the employer's use of such a weapon is the crux of this dispute.
 
 
 28
 The interest of preserving labor peace through the use of arbitration, therefore, is very much at stake here. That being so, the presumption in favor of arbitrability continues in full force, even though the controversy affects an employee benefit plan. See Adams v. Gould, Inc., 687 F.2d 27 (3d Cir.1982), (pension benefits). See also Grossmuller v. International Union, United Automobile Aerospace & Agricultural Implement Workers of America, 715 F.2d 853 (3d Cir.1983) (pension benefits).
 
 
 29
 This is not a case in which ERISA provisions are in conflict with the national labor policy. Therefore use of the grievance procedure does not deprive an employee of a statutory right. Cf. Barrentine v. Arkansas-Best Freight System, Inc., 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981); Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). In those cases benefits created by the Fair Labor Standards Act were affected, but here any program to which Shenango employees are entitled springs initially from the collective bargaining agreement. See Sutton, 724 F.2d 406 (4th Cir.1983). Consequently, unless the arbitration results favorably to the plaintiffs, no procedural rights created by Congress will come into being.[5]
 
 
 30
 In sum, the extent of the obligation to contribute to the hospitalization Plan is fixed by the collective bargaining agreement. Its provisions relegate disputes about "contract interpretation and application" to arbitration. Because the parties to this suit are parties to the labor agreement, we conclude that plaintiffs must first follow the grievance procedure.
 
 
 31
 On remand the district court should stay the ERISA claims pending the results of the grievance procedures. See Amaro v. Continental Can Co., 724 F.2d 747, 752 (9th Cir.1984); Air Line Pilots Association International v. Northwest AirLines, Inc., 627 F.2d 272 (D.C.Cir.1980); Mason-Dixon Lines, Inc. v. Local Union No. 560, International Brotherhood of Teamsters, 443 F.2d 807 (3d Cir.1971). If arbitration establishes that no obligation to continue premium payments existed on the termination of the labor agreement, the district court shall dismiss the complaint with prejudice.
 
 
 32
 If, however, it is determined that the employer had a continuing duty to provide coverage, the district court shall then consider the merits of the ERISA claim. Because we conclude that those issues are not properly before us at this time, we do not pass on the contentions of the parties as to that claim.
 
 
 33
 Accordingly, the judgment will be vacated, and the matter will be remanded to the district court for further proceedings consistent with this opinion.
 
 
 34
 Each party to bear its own costs.
 
 
 
 [1]
 The insurance Plan provided that an employee was given the privilege of converting the coverage into an individual policy at any time within ninety days after termination of the group program. Because the ninety-day period had not expired at the time of settlement, the company elected to pay an individual's conversion premium when it was less than the amount of the actual medical bills. In that instance, Blue Cross paid the doctor or hospital
 
 
 [2]
 The Plan booklet describes the insurance program, but, according to the employer, is not the actual Plan. The policies negotiated by the company with Blue Cross/Blue Shield are said to be the controlling documents
 
 
 [3]
 Because Shenango did not pay the usual premiums during the strike period, the employees submit that the company has retained money that rightly belongs to employees covered by the Plan
 
 
 [4]
 Because none of the matters which would ordinarily be resolved by an organization such as Blue Cross are at stake here, we find unconvincing the company's position that referral of claims to that organization is a pre-requisite to the plaintiffs' cause of action here. The meaning of the collective bargaining agreement and the Plan as to payment of insurance premiums is not within the competence of Blue Cross/Blue Shield
 
 
 [5]
 We note that during the strike, the Steelworkers filed an unfair labor practice with the NLRB over the same controversy presented here. That part of the charge was withdrawn when Region 6 of the Board advised the union that the matter was subject to arbitration and that the Board would defer to that process