### Richard NAZAY, Sr.

v.

### L. MILLER, an individual; Bethlehem Steel Corporation; and Michael P. Dopera, Secretary Insurance Board Bethlehem Steel Corporation, Appellants.

#### No. 91–5369.

United States Court of Appeals,
Third Circuit.

Argued Oct. 28, 1991.

Decided Dec. 6, 1991.

G. Daniel Carney (argued), Joseph Mack, III, Barbara K. Ross, Thorp, Reed & Armstrong, Pittsburgh, Pa., for appellants.

Robert J. Mulderig (argued), Ron Turo, Law Office of Ron Turo, Carlisle, Pa., for appellee.

Fred S. Sommer, E. Calvin Golumbic (argued), Jonathan H. Kureno, Helen L. Gemmill, Arent Fox Kintner Plotkin & Kahn, Steven A. Bokat, Robin S. Conrad, Mona C. Zeiberg, National Chamber Litigation Center, Inc., Washington, D.C., for amicus curiae Chamber of Commerce of the U.S.

Jeffrey S. Powell, Kirkland & Ellis, Chicago, Ill., for amici curiae Blue Cross and Blue Shield Ass'n, Blue Cross of Western Pennsylvania and Pennsylvania Blue Shield.

G. Stewart Webb, Jr., Jeffrey P. Ayres, Darrell R. VanDusen, Venable, Baetjer & Howard, Baltimore, Md., for amicus curiae American Iron and Steel Institute.

Arthur N. Lerner, Barbara H. Ryland, Michaels & Wishner, P.C., Washington, D.C., for amicus curiae Health Ins. Ass'n of America.

Before GREENBERG, ALITO and HIGGINBOTHAM, Circuit Judges.

---

OPINION OF THE COURT

GREENBERG, Circuit Judge.

Appellants, Bethlehem Steel Corporation ("BSC"), Larry Miller, an employee benefits administrator at BSC, and Michael Dopera, Secretary of the Insurance Board of BSC, appeal from the district court's order for summary judgment of April 19, 1991, 768 F.Supp. 124, in favor of appellee Richard Nazay, a retired employee of BSC in this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), to recover the balance due for Nazay's hospitalization.[1] In its opinion, the district court relied on *Northeast Dept. ILGWU Health and Welfare Fund v. Teamsters Local Union No. 229 Welfare Fund*, 764 F.2d 147 (3d Cir.1985), to hold that a penalty provision in BSC's health benefit plan, imposed upon Nazay for his failure to certify according to the terms of the plan, was arbitrary and capricious. Further, the court held that it would not enforce any provision in a benefit plan that denied benefits unless the employer could establish prejudice to the plan by reason of the failure of the participant to comply with the provision.

We disagree with the district court's interpretation of *Northeast* and find the court's prejudice rule at odds with our jurisprudence on this subject. Accordingly, we will reverse the court's order for summary judgment and will remand the case with directions that the district court enter summary judgment in favor of appellants.

## I.

The facts in this case are not in dispute. Nazay is a retired employee of BSC and a participant in BSC's Comprehensive Medical Program for Eligible Nonrepresented Salaried Pensioners and Surviving Spouses ("the Plan"), an ERISA plan subject to 29 U.S.C. § 1002. In the spring of 1989, Nazay experienced dyspnea, a shortness of breath associated with heart disease. On June 15, 1989, Dr. Conner, his internist,

---

1. The American Iron and Steel Institute, Blue Cross and Blue Shield Associations, Blue Cross of Western Pennsylvania, Pennsylvania Blue Shield, the Chamber of Commerce of the United States and the Health Insurance Association of America have submitted amicus curiae briefs also urging a reversal of the decision below.

examined him for this condition and referred him to Dr. Pease, a cardiologist who examined him on June 20, 1989. On June 21, 1989, Dr. Conner phoned Nazay and told him that, after consulting with Dr. Pease, he recommended that Nazay be hospitalized for treatment with Dobutamine, a drug which stimulates and improves heart muscle contraction. The doctors agreed that it was imperative that Nazay's hospitalization take place within a few days.

On June 22, 1989, pursuant to Dr. Conner's instruction, Nazay admitted himself to the Harrisburg Hospital through its admission desk for progressive cardiac decompensation with a severe, congestive cardiac myopathy. Although Nazay had been provided a Blue Cross card indicating that the Plan required certification, and he knew of the Plan's certification requirements before his hospitalization, he did not notify a BSC administrator before admitting himself to the hospital. Moreover, Nazay had mistakenly retained his outdated Blue Cross card that did not contain the certification requirements; thus, when he gave this outdated card to the hospital employees upon his arrival, they were not alerted to contact a BSC administrator. Further, neither Nazay, his doctor, a family member nor a hospital staff employee notified or attempted to notify BSC of Nazay's hospitalization during his stay. Indeed, Nazay admits that he did not think about the certification requirements until he received his bill.

BSC's certification procedure requires that either the participant, his doctor, the hospital or a family member contact a "health benefits coordinator" and provide information concerning the proposed medical care prior to the participant's admission to a hospital. This policy enables the administrator to review the merits of the proposed hospitalization and to discuss alternatives to hospitalization with the participant. Importantly, it also permits the patient and provider to ascertain how much of the proposed hospitalization will be reimbursed. Where the hospitalization is deemed necessary, 100% of the expenses will be reimbursed; if the hospitalization is deemed unnecessary, the provider will grant no reimbursement. If the participant does not obtain certification, a penalty, which was 30% of the otherwise covered expenses at the time of Nazay's hospitalization, is imposed. The Plan, however, contains a proviso which permits certification to take place within 48 hours of hospitalization when the patient is admitted on an emergency basis.[2] While the Plan refers to certification in advance of admission as precertification and certification following an emergency admission as simply certification, as a matter of convenience we will refer to both procedures as certification.

BSC instituted the certification requirement in February 1984, in an effort to reduce unnecessary hospitalizations and to ensure that there would be informed decisions concerning hospitalization. Although the Plan administrator forgave the 30% penalty (by waiving the certification requirement) incurred by participants for a break-in period of approximately one year, the administrator has enforced the certification requirement and imposed the penal-

2. Specifically, the Plan provides, in pertinent part:

> Whenever you or one of your dependents are to be admitted as an inpatient on a non-emergency basis to a Hospital ..., a precertification request must be processed *prior* to the admission.
>
> When a Physician recommends an admission to a Facility or use of a service requiring precertification, a telephone call must be made to the Health Benefits Coordinator who will make a determination as to medical necessity, the appropriate level of care and the allowable length of stay.

> If you are admitted to any facility requiring precertification on an emergency basis, the certification process must begin within 48 hours of the admission (or as soon as reasonably practical under the circumstances) unless such requirement is waived by the Plan Administrator.
>
> \*    \*    \*    \*    \*    \*
>
> If you fail to obtain precertification or certification as described above and the admission or services rendered are determined to have been medically necessary, a penalty of an additional 30% of the Covered Expenses will be applied.

App. at 31 (emphasis in original).

ty consistently since 1985. Notably, the administrator has waived the certification requirement in only 14 cases since 1985, each of which involved extraordinary circumstances where compliance with the requirement was virtually impossible.

On the basis of Nazay's non-compliance with the Plan's procedure, he was billed $2,231.51 by Blue Cross reflecting the 30% penalty.[3] In response, Nazay wrote to Miller, a benefits administrator, on November 17, 1989, and requested, for the first time, that he waive the certification requirement. In a letter dated February 12, 1990, the assistant secretary of the board replied to Nazay's letter and denied a waiver on the ground that the Plan required a 30% reduction for hospitalization not properly certified. In the assistant secretary's words, "we are bound by the contract language and cannot, therefore, rescind the penalty imposed by Blue Cross for this service." *Id.*

On February 28, 1990, Nazay appealed from the assistant secretary's decision but on June 20, 1990, Dopera, the secretary of the insurance board, affirmed the assistant secretary's determination, holding that a complete review provided no basis on which to waive the certification requirement.[4] On July 3, 1990, Nazay's counsel submitted a further appeal on his behalf but by letter of August 9, 1990, Dopera again denied Nazay's request to waive the certification requirement.

Following his unsuccessful appeals within BSC, Nazay commenced this action on August 23, 1990, in a Pennsylvania state court, alleging that appellants violated 29 U.S.C. § 1132(a)(1)(B)[5] by denying him health benefits to which he was entitled under the Plan. Appellants filed a petition to remove the case to the United States District Court for the Middle District of Pennsylvania on September 10, 1990, pursuant to 28 U.S.C. § 1441(b), asserting that the district court had jurisdiction under 29 U.S.C. §§ 1132(e)(1) and (2).

In his argument to the district court on cross-motions for summary judgment, Nazay claimed that appellants violated ERISA in two respects: first, BSC unlawfully included a penalty provision in the Plan for failure to comply with its certification requirements; second, Miller and/or Dopera unjustifiably refused to waive the penalty imposed upon Nazay when he did not certify according to the terms of the Plan.[6] Nazay argued that this case was governed by *Northeast Dept. ILGWU Health and Welfare Fund v. Teamsters Local Union No. 229 Welfare Fund,* 764 F.2d at 147, which held, *inter alia,* that the incorporation of an "escape" clause by trustees of a multi-employer health benefit plan governed by ERISA constituted arbitrary and capricious conduct as a matter of law. He contended that the inclusion of a penalty provision *by BSC,* the employer, for the failure to properly certify similarly constitutes arbitrary and capricious conduct in

---

**3.** The record does not make the arrangements between the Plan and Blue Cross clear but we note that in its amicus curiae brief the Blue Cross and Blue Shield entities indicate that their plans "underwrite and/or administer group programs with preadmission certification requirements like the one that is at issue in this case." We need not determine the precise contours of this relationship as our result is not dependent on it.

**4.** Under the terms of the Plan, a participant may appeal benefit denials to the Plan administrator who has authority to decide questions relating to the operation of the Plan. While the record is not completely clear as to the exact function of each person involved in the appeal process we need not be concerned with that as there is no suggestion that Nazay's claim was rejected by reason of administrative procedural default.

**5.** While the complaint was simply recited to be filed under ERISA in general, it clearly was filed under section 1132 which provides, in pertinent part, that

   (a) A civil action may be brought—
    (1) by a participant or beneficiary—
    (B) to recover benefits due him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the plan.

**6.** Neither Nazay nor the district court discussed the significance of the differences between Miller's and Dopera's authority at BSC. We will not dwell on the point as it is clear that a waiver was refused at all levels of review.

violation of ERISA.[7]

The district court accepted Nazay's argument and took the opportunity to create a far-reaching rule concerning judicial review of benefit plans. It analogized the certification requirement to notice provisions in liability insurance policies, which Pennsylvania state courts have refused to enforce absent a showing of prejudice to the insurance carrier by reason of non-compliance with the notice provisions. In the same way, the district court declined to enforce the certification requirement in this case because it believed there was no prejudice to the Plan from Nazay's failure to obtain certification. It held that its "rule requiring prejudice before benefits can be denied is consonant with ERISA's goal of providing coverage which the participant reasonably anticipates receiving."

We find that the district court's reliance on *Northeast* was misplaced. In our view, BSC, as an employer, is free to develop an employee benefit plan as it wishes because the creation of a benefit plan is a corporate management decision unrestricted by ERISA's fiduciary duties. Therefore, the arbitrary and capricious standard which may attach to fiduciary decisions does not apply. Moreover, Dopera, who appellants concede was acting as a fiduciary when he refused to waive the certification provision, did not act in an arbitrary or capricious manner because Nazay could easily have complied with the Plan's procedure. Finally, the district court's admonition that it will not deny any benefit provision unless the employer can establish prejudice to the Plan by reason of the participant's failure to comply with the certification provisions, constitutes an unauthorized usurpation of BSC's management authority and would hamper BSC's legitimate effort to reduce the rising costs of healthcare.

## II.

■ Because we are only authorized to review final judgments of the district court, 28 U.S.C. § 1291, denials of summary judgment are ordinarily not appealable. *Chinchello v. Fenton*, 805 F.2d 126, 129 (3d Cir.1986); *Metex Corp. v. ACS Industries, Inc.*, 748 F.2d 150, 153 (3d Cir. 1984). However, when an appeal from a denial of summary judgment is raised in tandem with an appeal of an order granting a cross-motion for summary judgment, we have jurisdiction to review the propriety of the denial of summary judgment by the district court. *Beck v. Reliance Steel Products Co.*, 860 F.2d 576, 581 (3d Cir. 1988); *First National Bank v. Lincoln National Life Insurance Co.*, 824 F.2d 277, 281 (3d Cir.1987).

■ In most cases, an appellate court reversing a grant of summary judgment will not direct the district court to enter a summary judgment order in favor of the appellant because a genuine issue of material fact will remain. *First National*, 824 F.2d at 281. However, where the facts are uncontroverted, as in this case, we are free to enter an order directing summary judgment in favor of the appellant. *Id. See also Morgan Guaranty Trust Co. v. Martin*, 466 F.2d 593, 599–600 (7th Cir.1972) (per curiam). Indeed, 28 U.S.C. § 2106 dealing with our authority on disposition of an appeal provides that we "may remand the cause and direct the entry of such appropriate judgment, decree, or order...." This rule is consonant with the important policy of conserving scarce judicial resources because it avoids remanding for trial where factual development is not required.

## III.

### A. THE EMPLOYER'S ALLEGED BREACH OF FIDUCIARY DUTY

On this appeal, appellants contend that the district court improperly relied upon *Northeast* to hold that BSC breached its fiduciary duty under ERISA by including in the Plan a penalty provision to be imposed upon participants who fail to comply

---

7. Because both Nazay and the district court were not definite as to whether the mere inclusion of the penalty provision in the health plan by BSC constitutes a violation of ERISA or whether Dopera's refusal to waive the certification requirement constitutes arbitrary and capricious conduct, this opinion will address both issues.

with the Plan's certification requirements. Although conceding that in *Northeast* we held an escape clause to be invalid as a matter of law when incorporated in a liability policy by trustees of a multi-employer fund, appellants argue that the trustees in that case were obligated to comply with ERISA's fiduciary standards whereas BSC, as an employer and sponsor of the Plan, is not. In addition, appellants argue that, even if we were to review BSC's conduct in accordance with the standards governing conduct by fiduciaries, BSC did not act in an arbitrary and capricious manner. Appellants further argue that, unlike our opinion in *Northeast,* the district court's determination will not further the policies underlying ERISA.

Nazay maintains that the district court properly relied on *Northeast* to hold that the substantive provisions in benefit plans governed by ERISA are subject to the "arbitrary and capricious" standard of judicial review, and that the blanket 30% penalty in this case was both arbitrary and capricious. He asserts that the imposition of the penalty denied him a benefit he reasonably anticipated, and this denial contravenes ERISA's policies as previously delineated by this court.

### 1. Employers' Fiduciary Duties Under ERISA

■ In the words of the Supreme Court, ERISA was "designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 90, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983). However, as we have observed on several occasions, ERISA's concern is with the *administration* of benefit plans and not with the precise design of the plan. *Hozier v. Midwest Fasteners, Inc.,* 908 F.2d 1155, 1159 n. 3 (3d Cir.1990); *Hlinka v. Bethlehem Steel Corp.,* 863 F.2d 279, 283 (3d Cir.1988); *Vig-*

*giano v. Shenango China Division of Anchor Hocking Corp.,* 750 F.2d 276, 279 (3d Cir.1984). In enacting ERISA, Congress did not impose a duty on employers to provide healthcare or other benefits to their employees. Rather, the clear emphasis of the statute is to ensure the proper execution of plans once established: "ERISA is not a direction to employers as to what benefits to grant their employees. Rather, ERISA is concerned with the *administration* of an established plan and its elements." *Hlinka v. Bethlehem Steel Corp.,* 863 F.2d at 283 (emphasis in original).

To secure the proper administration of benefit plans, ERISA imposes a heightened standard of care on fiduciaries,[8] who must "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries and ... for the exclusive purpose of ... providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a)(1).

■ Employers occupy a precarious position vis-à-vis ERISA's fiduciary mandates as "ERISA permits employers to wear 'two hats,' and ... they assume fiduciary status 'only when and to the extent' that they function in their capacity as plan administrators, not when they conduct business that is not regulated by ERISA." *Belade v. ITT Corp.,* 909 F.2d 736, 738 (2d Cir. 1990) (per curiam) (*quoting Amato v. Western Union International,* 773 F.2d 1402, 1416–17 (2d Cir.1985), *cert. dismissed,* 474 U.S. 1113, 106 S.Ct. 1167, 89 L.Ed.2d 288 (1986)). *Accord, Hozier v. Midwest Fasteners, Inc.,* 908 F.2d at 1158. Although the determination of whether an employer acts in the capacity of a business manager or administrator involves a sensitive analysis, our prior decisions confirm that BSC's inclusion of the penalty provision in the case at bar was a management decision.

---

**8.** 29 U.S.C. § 1002(21)(A) provides,
[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

In *Trenton v. Scott Paper Co.*, 832 F.2d 806 (3d Cir.1987), *cert. denied*, 485 U.S. 1022, 108 S.Ct. 1576, 99 L.Ed.2d 891 (1988), we endorsed the design/administration distinction in analyzing whether an employer acts in a management or administrative capacity. In that case, Scott Paper Company ("Scott") sponsored a benefit plan called the Scott Highly Accelerated Retirement Program ("SHARP") to provide an incentive to certain salaried employees to retire early and thereby reduce the workforce which, in Scott's view, was overstaffed. SHARP amended the Scott Paper Company Salaried Employees Retirement Plan ("SERP"), but only some employees eligible for SERP could benefit from SHARP's amendments. Those SERP-covered employees excluded from SHARP brought suit, alleging, *inter alia*, that the managing board of SERP which had created SHARP breached its fiduciary duty owed to the employees under ERISA by adopting and implementing SHARP for the benefit of Scott and not for the benefit of all SERP participants and beneficiaries. Scott and the managing board defended the implementation of SHARP as a proper exercise of Scott's management authority because "the decision to offer SHARP to a limited number of Scott employees was a *design* decision rather than an *administration* decision [and] ... the administrators of a pension plan have a fiduciary duty *only* with regard to administration decisions and are bound by no such duty with regard to design decisions." *Id.* at 808–09 (emphasis in original). We agreed, noting "[t]he design of the SHARP plan was purely a corporate management decision. It defies common sense to suggest that a corporation must allow a retirement board to make personnel decisions such as determining which plants need fewer employees." *Id.* at 809.

Following the *Scott Paper* methodology, in *Hlinka v. Bethlehem Steel Corp.*, 863 F.2d at 279, we held that BSC's previous benefit plan, which permitted BSC to determine whether it would allow an employee to take advantage of its early retirement plan if that retirement was in BSC's interest, did not violate ERISA as a matter of law. We first noted that ERISA protects an employee's accrued benefits, and is not "intended to assure the sanctity of early retirement expectations." *Id.* at 284 (*quoting Bencivenga v. Western Pa. Teamsters & Employers Pension Fund*, 763 F.2d 574, 577 (3d Cir.1985)). Thus, the employee did not have a "right" to early retirement benefits. Second, we found that the employer's design of the plan, whereby the employer retained discretionary authority to assess its best interest concerning the early retirement of its employees, did not violate ERISA because "BSC in drafting the plan was acting as an employer and not a fiduciary." *Id.* at 285.

Next, in *Payonk v. HMW Industries, Inc.*, 883 F.2d 221 (3d Cir.1989), we examined whether any fiduciary duties attached to an employer's termination of a benefit plan. Although the employees in that case agreed that HMW, the employer, did not act as a fiduciary in terminating the plan, they urged that HMW nonetheless had a duty to inform the employees of the intended termination because it was obligated to protect their existing interests and entitlements to benefits. We rejected that contention and held "the fallacy in [the employees'] argument lies in [their] failure to distinguish between the role played by HMW as an employer, who in that capacity owes a fiduciary duty not to the plan participants, but to its stockholders, and the role played by HMW as a fiduciary of the plan where its fiduciary obligations pertain solely to plan administration, and to the plan participants." *Id.* at 229. Because HMW acted in a management capacity in terminating the plan, ERISA's fiduciary duties, including the duty to notify employees of benefit changes, did not attach.

In *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d at 1155, we held that ERISA's fiduciary duties did not attach to an employer's decision to amend a severance plan, thereby making explicit what we had implicitly assumed in *Payonk*, because the plaintiffs in that case had conceded the same. We observed that ERISA's language, structure, and legislative history compelled the result, for if an employer's

decision to amend a plan were governed by ERISA's fiduciary duties, a decision to terminate or cut back benefits would rarely pass muster in the absence of employer insolvency.[9]  *Id.* at 1159.

Most recently, in *Hamilton v. Air Jamaica, Ltd.*, 945 F.2d 74 (3d Cir.1991), we held that an employer's written reservation of the right to determine benefits as they accrue was consistent with the policies of ERISA. There, Hamilton, an account executive of Air Jamaica, received an employee handbook which included a provision whereby Air Jamaica reserved the authority to "alter, reduce or eliminate any pay practice, policy or benefit." *Id.* at 76. On May 25, 1989, Air Jamaica informed Hamilton by letter that he would be terminated as part of a corporate reorganization. *Id.* That letter also outlined the severance benefits to which Hamilton would be entitled. Those benefits, which Hamilton ultimately received, were substantially lower than the benefits outlined in the employee handbook.[10] Hamilton brought suit to collect the difference in benefits.

The district court held that Air Jamaica was bound to enforce the benefits outlined in the handbook. While we agreed that an employee is entitled to rely upon a written benefit plan until that plan is duly amended, we held that the written plan in that case explicitly provided that Air Jamaica could determine benefits on a case-by-case basis. We upheld the retention of such authority for three reasons. *Id.* at 78. First, we found that "Air Jamaica's reservation [was] not an attempt … to avoid 'award[ing] benefits in accord with its written promises.' On the contrary, the reservation is part of the written promise and a limitation upon it." *Id.* Second, we held that ERISA did not "require that Air Jamaica provide any particular set of benefits, if it decides to establish a welfare benefits plan." *Id.* (footnote omitted). Finally, we concluded that "it is not true that

permitting employers to reserve the right to make individual benefit determinations will render the protections of ERISA illusory." *Id.* Although ERISA requires that benefit plans be established and administered in accordance with procedural safeguards, Air Jamaica employees were on notice that they had no guaranteed benefits. Moreover, this retention of power served a salutary purpose vis-à-vis the employees because "[e]mployers are understandably more willing to provide employee benefits when they can reserve the right to decrease or eliminate those benefits." *Id.* at 79.

Our decisions make clear beyond any question that BSC's inclusion of a penalty provision in the Plan was a design decision and in including the penalty in the Plan BSC owed no fiduciary duty to the Plan participants. Accordingly, BSC was not obligated to act with undivided loyalty toward its employees and its actions should not be reviewed to assess compliance with ERISA's fiduciary mandates.

### 2. *Northeast* and Judicial Review of Benefit Plans

Nazay and the district court read our decision in *Northeast* to stand for the proposition that the substantive provisions of a benefit plan are subject to judicial review without regard to whether fiduciary conduct is implicated. Specifically, Nazay posits that, under *Northeast*, the court has the authority to invalidate a plan provision enacted by an employer if the provision is arbitrary and capricious. Accordingly, Nazay urges us to affirm the district court's holding that the penalty provision in the Plan is unenforceable as a matter of law.

A closer reading of *Northeast* belies Nazay's characterization of that opinion. In addition, important distinctions between *Northeast* and the present case support different determinations concerning the va-

---

9. We recognized, however, that an employer does not have "unfettered discretion to amend or terminate plans at will," *id.* at 1162, as ERISA limits this power through, for example, its accrual and vesting provisions which govern pension plans.

10. According to Air Jamaica, the benefits Hamilton received were in accordance with its long-standing policy, and the employee handbook's higher figure was due to a printer's error.

lidity of the separate benefit provisions of the plans involved.

In *Northeast,* we considered whether an escape clause inserted in a multi-employer benefit plan by *trustees* of that plan violated ERISA. There, Ruth Fazio, an employee who was both a participant in the International Ladies' Garment Workers' Union Health and Welfare Fund ("ILGWU Fund") and a beneficiary of her husband's benefit plan, the Teamsters Fund, underwent surgery and submitted the bill for that medical treatment to the ILGWU Fund. The ILGWU Fund advised her that she was not eligible for benefits because of the "other insurance" clause [11] contained in that policy; that clause required her to collect under her husband's benefit plan. After submitting the bill to the Teamsters Fund, Fazio was advised that it, too, refused to pay because of an "other insurance" clause in its own policy.[12] Fazio then brought suit in federal court, naming both funds as defendants. Because the district court was convinced that Fazio would collect under one of the policies, it suggested, and defendants agreed, that the ILGWU Fund pay the medical expenses and commence a declaratory judgment action against the Teamsters Fund to resolve the conflict between the "other insurance" provisions in the two policies. In that declaratory judgment action, the district court found the Teamsters Fund to be solely liable.

On appeal, the Teamsters Fund asserted that, because the escape clause in ILGWU's policy violated the language and policy of ERISA, the "conflict" between the other insurance clauses disappeared and ILGWU alone would be obligated to pay. In assessing the merits of that argument, we looked to state law for guidance on the enforceability of insurance provisions, and agreed that provisions that conflict with public policy are not enforceable. *Northeast,* 764 F.2d at 161. We therefore declared that the question before us was whether "the ILGWU escape clause violates the ERISA mandate against arbitrary and capricious conduct *on behalf of fund trustees."* *Id.* (emphasis supplied).

First, we noted that a trustee's decision satisfies the fiduciary requirements under 29 U.S.C. § 1104 unless that decision is arbitrary and capricious; where a decision contravenes the purpose of ERISA, it constitutes arbitrary and capricious conduct *per se.* Next, we set out to divine the policies underlying ERISA. Upon reviewing section 1001, the congressional findings and declaration of policy, we found that "one very important policy underlying ERISA is that employees enrolled in a benefit plan should not be deprived of compensation that they reasonably anticipate under the plan's purported coverage." 764 F.2d at 163 (footnote omitted). Finally, we concluded that, because escape clauses create a severe risk that employees will be deprived of benefits they reasonably expect and subject the employee to automatic and complete loss of coverage in the presence of another plan, they violate ERISA's policy and are unenforceable as a matter of law.

*Northeast* is distinguishable from the present case in fundamental ways. Most importantly, the premise from which we conducted our analysis in *Northeast* was that *trustees* are bound to act in accordance with ERISA's fiduciary standards. In contrast, BSC, as an employer and sponsor of the Plan, has no such obligation for reasons set forth above. Thus, the arbitrary and capricious standard does not even apply.[13]

---

11. The "other insurance" clause in the ILGWU Fund was known as an "escape" clause, which provides an outright exception to coverage if the insured is covered under another policy.

12. The Teamsters Fund's clause is an "excess" clause, which provides the insured with excess protection where coverage under another policy is available.

13. Our opinion explicitly framed and discussed the issue in the context of *fiduciary* duties under ERISA: "An 'other insurance' clause in [an] ERISA-covered benefit plan is therefore enforceable unless it reflects an arbitrary and capricious judgment *by the plan's trustees."* 764 F.2d at 163 (emphasis supplied). We also said "[i]n our view, *trustees* who incorporate in a plan a provision that has the potential to harm participants in this way have indeed acted in an arbitrary and capricious manner." *Id.* (footnote omitted) (emphasis supplied). Thus, our broad statement that "escape clauses are unenforcea-

Second, *Northeast* concerned a multi-employer plan, not a single employer plan as is involved in this case. The Court of Appeals for the Sixth Circuit in *Musto v. American General Corp.*, 861 F.2d 897 (6th Cir.1988), *cert. denied*, 490 U.S. 1020, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989), faced with the same argument appellee urges here, recognized the importance of this distinction. The district court in that case relied on *Northeast* to hold unlawful an escape clause included in the single employer plan by the employer. The court of appeals deemed such reliance to be misplaced and offered several justifications for requiring trustees of a multi-employer plan to act in accordance with ERISA's fiduciary standards but not an employer of a single plan:

> In amending a *multi-employer* plan, where the level of contributions of each participating employer has generally been set by collective bargaining, the trustees 'affect the allocation of a finite plan asset pool between participants,' as defendants point out in their brief, and hence act as plan administrators subject to a fiduciary duty. But when, as here, there is only one employer, there is normally no 'plan asset pool' to be affected. In amending a single employer plan, therefore, the company normally acts in its role as employer, not in its role as fiduciary.

*Id.* at 912 (emphasis in original).[14]

For these same reasons, BSC should not be deemed to have acted as a fiduciary when it created the Plan and included a penalty provision for the failure to properly certify.

Third, our focus in *Northeast* was to ensure that employees not be deprived of benefits they reasonably anticipate. In that case, it was certainly reasonable for Fazio to expect that one of the two insurers would pay for her medical treatment. Indeed, we specifically recognized the intricacy of "other insurance" law, noting that "given the complexity of 'other insurance'

law, the reality is that most participants will not make informed choices but … will instead be surprised when their plan refuses to pay for costs apparently within its coverage." *Northeast*, 764 F.2d at 164 n. 16. In the present case, however, it was not "reasonable" for Nazay to believe that the penalty would not be imposed, since the Plan clearly states that the penalty will be imposed for the failure to certify. Indeed, Nazay conceded that he *knew* prior to his hospitalization of BSC's penalty provision. Moreover, this case does not involve nearly the same complexity as did *Northeast*, for all Nazay had to do to be adequately apprised of his rights was to review a clearly-written document.

Fourth, we were particularly disturbed in *Northeast* by the fact that escape clauses automatically and completely deprive the participant of any benefits in the presence of another plan, even if the terms of the other plan are much less favorable. In sharp contrast, the penalty provision in the case at bar does not work such a forfeiture; rather it reduces by 30% the amount that BSC will reimburse the participant for medically necessary hospitalization.

Finally, in *District 2, United Mine Workers v. Helen Mining Co.*, 762 F.2d 1155 (3d Cir.1985), *cert. denied*, 474 U.S. 1006, 106 S.Ct. 527, 88 L.Ed.2d 459 (1985), we implicitly found that a collectively bargained provision requiring prior approval for hospitalization did not violate federal law or policy. *Id.* at 1160. This decision further supports the view that *Northeast* does not control the disposition of this case and should not be read to create new ERISA duties on the part of the employer.

**B. THE PLAN ADMINISTRATOR'S ALLEGED BREACH OF FIDUCIARY DUTY**

**1. An "Arbitrary and Capricious" Standard of Review Is Appropriate in This Case**

■ In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103

---

ble in ERISA covered benefits plans as a matter of law," *id.* at 164 n. 18, must be understood to stem from an analysis of fiduciary responsibilities.

**14.** The case at bar presents an even easier question, because Nazay does not characterize BSC's action as an unlawful "amendment" to the Plan.

L.Ed.2d 80 (1989), the Supreme Court set forth the different standards of judicial review in section 1132(a)(1)(B) actions challenging denials of benefits. In that case, former employees who were terminated by an employer and hired by the successor corporation upon sale of the employer's plant brought suit in the Eastern District of Pennsylvania, alleging that the employer's actions violated ERISA. The district court granted the employer's motion for summary judgment. In ruling on the employees' appeal, we developed a framework for judicial review of fiduciary actions under ERISA. *Bruch v. Firestone Tire & Rubber Co.*, 828 F.2d 134, 145 (3d Cir.1987). We held that judicial review should be more rigorous where the administrator is also the employer because of the potential conflict of interest; in this context, a *de novo* standard of review is appropriate. When the administrator lacks an interest adverse to the employees, the more deferential "arbitrary and capricious" standard of review is appropriate. *Id.* at 137–45.

On grant of certiorari, the Supreme Court similarly concluded that distinct levels of review are proper for different fiduciary actions, but grounded its conclusion on an alternative basis. At the outset, it observed that the courts had adopted the "arbitrary and capricious" review in the ERISA context because such review was developed under 29 U.S.C. § 186(c), a provision of the Labor Management Relations Act ("LMRA"). 489 U.S. at 108, 109 S.Ct. at 953. Application of this standard was buttressed by the fact that Congress had intended to incorporate LMRA fiduciary law into ERISA and that ERISA, like the LMRA, imposes a duty of loyalty on fiduciaries and plan administrators. However, the Court found that the *"wholesale* importation" of the arbitrary and capricious standard was unwarranted because that standard had been crafted in LMRA law to provide a basis for jurisdiction. *Id.* at 108, 109 S.Ct. at 953. As ERISA provides a

jurisdictional basis for review of fiduciary conduct, 29 U.S.C. §§ 1132(a), 1132(f), the *"raison d'être"* for LMRA's "arbitrary and capricious" standard was not present. 489 U.S. at 109, 109 S.Ct. at 954.

Thus, in ascertaining the proper level of review under ERISA, the Supreme Court noted that "ERISA abounds with the language and terminology of trust law," *Id.* at 110, 109 S.Ct. at 954, and accordingly looked to trust jurisprudence for guidance. It found that a deferential standard of review of a trustee's actions is appropriate when a trustee exercises discretionary powers, but where the trustee does not exercise discretionary authority vested in him by the trust instrument, a *de novo* standard of review is proper: "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." 489 U.S. at 115, 109 S.Ct. at 956. *Bruch* also stated: "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'factor[ ] in determining whether there is an abuse of discretion.' " *Id.* at 115, 109 S.Ct. at 956 (citing Restatement (Second) of Trusts § 187, comment d (1959)).

The present case compels us to apply *Bruch's* principles. Interestingly, amicus briefs submitted by the American Iron and Steel Institute and the Health Insurance Association of America assert that the administrator exercised no discretion in imposing the penalty but merely applied the terms of the Plan as required. American Iron and Steel Institute Br. at 7–8; Health Insurance Association of America Br. at 12–13. Further, the insurance board's assistant secretary's February 12, 1990, letter intimates that the board was *obligated* to impose the 30% penalty.[15] In this context, *de novo* review would initially appear

---

15. The assistant secretary of BSC's insurance board, responding to Nazay's November 17, 1989 letter to Miller requesting that Miller waive the "penalty," refused Nazay's request on the following basis: "[T]he contract language ... stipulates that the penalty will be applied to hospital confinements that were not precertified, [and] we are bound by the contract language and cannot, therefore, rescind the penalty imposed by Blue Cross for this service."

to be appropriate and it would, of course, lead to a denial of benefits as Nazay simply did not comply with the certification requirements. However, appellants' brief underscores the fact that the Plan *does* endow the administrator with the discretion and authority to

> interpret and construe the provisions of the Plan, to determine eligibility to participate in the Plan, to make and enforce such rules and regulations as the Plan Administrator shall deem necessary and proper for the efficient administration of the Plan, and to decide such questions as may arise in connection with the operation of the Plan.

App. at 38.

Moreover, the board's secretary's June 20, 1990, letter to Nazay and his August 9, 1990, letter to Nazay's counsel asserts that he reviewed Nazay's case in its entirety in determining whether to waive the "penalty," indicating that the secretary believed he had the authority to waive the certification requirement and refused to do so in the exercise of his discretion. The record further indicates that in limited situations, waivers have been granted.

The record and briefs also present no evidence of a conflict of interest.[16] There were no allegations of bad faith. The employer, BSC, had incentives to avoid the loss of morale and higher wage demands that could result from denials of benefits. Finally, this was an individual rather than a class determination. *See Kotrosits v. GATX Corp. Non–Contributory Pension Plan*, 757 F.Supp. 1434, 1454–58 (E.D.Pa. 1991) (conflict of interest); *Daniels v. Anchor Hocking Corp.*, 758 F.Supp. 326, 330–

35 (W.D.Pa.1991) (no conflict of interest). These factors indicate that, under *Bruch*, the arbitrary and capricious standard of review is appropriately applied here.

We see no reason why we should not accept appellants' construction of the Plan as that reading can only be viewed as advantageous to Nazay.[17] Accordingly, our next step is to determine whether Dopera, who appellants assert possessed the authority to determine whether to waive the certification requirement, exercised that power in violation of ERISA. Our cases confirm that where, as here, an administrator is vested with discretion to enforce the terms of an ERISA plan, we must review the administrator's decisions to determine whether they are "arbitrary and capricious." *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 119 (3d Cir.1990).

2. The Plan Administrator Did Not Act in an Arbitrary and Capricious Manner

■ The district court found Dopera's *imposition* of the penalty to be arbitrary and capricious.[18] The court stated "the decision to deny medical benefits was made as an interpretation of the plan by the Insurance Board charged with administering it. It therefore qualifies as a decision subject to the fiduciary requirements of ERISA." The court also held that "the Board's action cannot be justified even under [the arbitrary and capricious] standard of review." Accordingly, we must analyze the propriety of the administrator's refusal to waive the certification requirement in Nazay's case. The Supreme Court in

---

**16.** This determination that there is no conflict of interest is significant. Where a conflict of interest was present, the Court of Appeals for the Eleventh Circuit remanded a case (presenting a different set of facts) where the lower court had upheld a preadmission certification clause under an arbitrary and capricious standard. *Brown v. Blue Cross and Blue Shield of Alabama, Inc.*, 898 F.2d 1556 (11th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991).

**17.** Further, the Supreme Court in *Bruch* indicated that, where a trustee has discretion to construe a given plan, his interpretation will not

be disturbed unless it is unreasonable. 109 S.Ct. at 954. Appellants' reading of the plan is reasonable in our view.

**18.** The court's opinion is somewhat vague, for it also contains language indicating that the penalty provision is arbitrary and capricious as a matter of law: "[A] provision imposing a blanket 30% penalty is arbitrary and capricious and cannot be upheld under ERISA." However, as discussed above, BSC, not the administrator, instituted the penalty and is not subject to ERISA's fiduciary requirements. Thus, BSC's inclusion of the penalty in the Plan cannot be found to be arbitrary and capricious.

*Bruch* cited with approval the Restatement (Second) of Trusts § 187 (1959), which provides: "Where discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court except to prevent an abuse by the trustee of his discretion." 489 U.S. at 110, 109 S.Ct. at 954. Hence, application of the "arbitrary and capricious" standard of review, in this context, turns on whether the administrator's refusal to waive the certification requirement was an abuse of discretion.

The administrator's decision not to waive the certification requirement for Nazay was neither arbitrary nor capricious and did not constitute an abuse of his discretion. The record establishes that the administrator has waived the certification requirement only 14 times since the requirement has been enforced. Further, in each of those cases, compliance with the certification was virtually impossible. For example, appellants' answers to interrogatories indicate that the certification requirement was waived where "the patient had a poor prognosis at admission and died shortly thereafter [or where] the patient was admitted to the hospital in a coma and had no family members who could have undertaken the precertification responsibility."

The unfortunate circumstances of Nazay's case are not equally compelling: Nazay knew for a full day that he would soon be hospitalized; he checked himself into the hospital on a regular admissions basis; his wife was available to phone the benefits coordinator; he mistakenly gave the hospital employee an outdated Blue Cross card; and neither he nor anyone on his behalf called BSC to inform it of Nazay's hospitalization during his entire stay. Indeed, the district court agreed that "[t]he record as a whole, however, shows that he could have [ ]certified at some point during his admission or within a reasonable time thereafter but that he simply did not do so, and instead allowed the hospital to forward its bill to the Board in the normal course." Nazay's explanation for failing to comply with the certification requirement was that he was preoccupied by his physical condition. However, if the administrator had accepted Nazay's justification and waived

the certification requirement on that basis, he would be obliged to waive the certification requirement in virtually every instance. In sum, the administrator did not abuse his discretion in refusing to waive the certification requirement. Although it may appear to be harsh to apply the certification requirement and its concomitant penalty in this case, there is no way we can interfere with this result.

We recognize that it is obvious that the 30% charge is a severe penalty. Apparently after giving further study to this problem, BSC later has reduced the penalty to participants for failure to obtain certification from 30% to a flat $100. In this case, Nazay has sustained a significant economic deprivation. While the administrator could have been less harsh, the 30% penalty did not violate ERISA though it is obvious that the message conveyed by the certification requirement could have been delivered with a far lesser penalty.

## C. THE DISTRICT COURT'S PREJUDICE REQUIREMENT

### 1. Propriety of Prejudice Rule Under ERISA

■ In striking down the Plan's provision imposing a penalty for failure to properly certify, the district court transplanted into the ERISA setting a rule created by the Pennsylvania Supreme Court in the automobile insurance context in *Brakeman v. Potomac Insurance Co.*, 472 Pa. 66, 371 A.2d 193 (1977). In that case, Baker, the insured under an auto insurance policy with Potomac, collided with Brakeman, who allegedly suffered permanent injuries. Baker's insurance policy required him to notify Potomac of any accident "as soon as practicable." 472 Pa. at 69, 371 A.2d at 195. However, Baker did not notify Potomac of the accident until after he had received a letter from Brakeman indicating that Brakeman had brought suit against Baker. As a result, Potomac refused to defend against Brakeman's suit or to accept any liability stemming from the accident.

Although the Pennsylvania Supreme Court had previously followed a traditional contract analysis to determine insurance

obligations, *Brakeman* eschewed that approach in favor of one that requires an insurance company to prove that it has suffered prejudice as a result of non-compliance with the notification provision in order to be relieved of its obligations. The court's decision to adopt this new mode of analysis turned on the unequal bargaining power it perceived between the insured and the insurance company, the harsh consequence of the notice provision and the reasonable expectations of the insured that he will be covered for an accident. Thus, the Supreme Court remanded the matter so that the insurance company, which had prevailed in the trial court under the old rule, could attempt to demonstrate that it had been prejudiced by the late notice.

Importation of the prejudice rule into the ERISA context is unwarranted and improper. First, ERISA does not require an employer to create a specific benefit plan and does not permit the courts to test the substantive reasonableness of the plan's provisions. *Hlinka v. Bethlehem Steel Corp.*, 863 F.2d at 283. Instead, ERISA permits judicial review of the administration of a plan once created. *Id.; see also Viggiano v. Shenango China Division of Anchor Hocking Corp.*, 750 F.2d at 279. Thus, the district court's rule is an impermissible usurpation of BSC's management authority.

Second, the only substantive review a court may make is to ensure that the plan does not violate ERISA's purpose. *Northeast*, 764 F.2d at 161.[19] For reasons set forth above, the Plan in question here does not contravene any fundamental ERISA-based policy. *See District 2, United Mine Workers v. Helen Mining Co.*, 762 F.2d at 1160 (benefit provision requiring prior approval for surgery not violative of federal

policy). Finally, the *Brakeman* court's concern over the harshness of the notice provision is not present in the case at bar. While in *Brakeman* the consequence for failing to comply with the notice provision was a complete denial of coverage, here the consequence for failing to comply is the imposition of a 30% penalty.[20] In sum, although the district court here correctly determined that the "notice provision and the precertification provision serve the same basic purpose—to permit the insurer to control expenditures by giving it early notice of potential claims," this congruity is not adequate grounds for departing from settled caselaw.

2. Prejudice to the Plan Due to Noncompliance with the Certification Requirements

■ Even if we were to follow the district court's rule requiring BSC to demonstrate prejudice to the Plan, BSC can demonstrate that prejudice would result if we were to invalidate the penalty provision. The record indicates that the purpose of the certification requirement is to:

identify unnecessary levels of care prior to the time the cost is incurred by the participant. This is accomplished by reviewing a treatment plan in advance and, where appropriate, treatment alternatives which are less costly and often less traumatic for the patient. It permits both the patient and the provider to know at the outset how much of the proposed cost will be reimbursed, rather than having this decision made after the fact on the basis of a retrospective utilization analysis.

App. at 33.

To give teeth to the certification requirement, BSC imposes a penalty on those who

---

**19.** *Northeast* established that one of ERISA's purposes is to further the reasonable expectations of the employees vis-a-vis their benefit plans. Here, Nazay could not have reasonably expected that he would not be penalized although he did not comply with the certification requirement of which he was aware.

**20.** Moreover, we limited *Brakeman*'s reach in *Hospital Support Services, Ltd. v. Kemper Group, Inc.*, 889 F.2d 1311 (3d Cir.1989), by refusing to extend the prejudice rule to the limitations of suit context because the policy underlying

*Brakeman* would not be furthered. In so holding, we recognized that "[u]nder the sweeping language of *Brakeman,* many clauses arguably could be held to be unenforceable absent a showing of prejudice." *Id.* at 1316. While we are pointing out that there was only a penalty and not a complete forfeiture of coverage here, we are not implying that if there had been a forfeiture our result would have been different. Rather, we are simply deciding the case on the basis of the facts present.

fail to comply with it; absent financial incentives, participants are not likely to comply.

Appellants and amici convincingly argue that widespread non-compliance with the certification requirement would trigger severe costs for BSC. First, non-compliance would boost the frequency of hospitalizations because the participant would not discuss medical alternatives with the health administrator. Appellants' Br. at 31. Second, the Insurance Board would be required to perform an even greater number of difficult and detailed post-hoc assessments of the necessity for hospital service. As the Health Insurance Association of America points out, "[t]he physician's willingness to cooperate in assessing the reasonableness of the treatment decision is likely to decrease dramatically where he or she has already rendered expensive care." Health Insurance Association of America Br. at 20. Third, those participants whose hospitalizations were deemed unnecessary would be forced to pay the entire bill without any reimbursement. Appellants' Br. at 30; Health Insurance Association of America Br. at 18.

In sum, BSC and its employees would be deprived of an important weapon in their joint battle against rising healthcare costs. Thus, it appears that the district court by focusing on this case rather than the overall administration of the Plan, erroneously concluded that BSC would not suffer prejudice if the penalty provision were not enforced.

### IV.

BSC did not violate ERISA by including a 30% penalty provision in the Plan for failure to comply with the Plan's certification process. In including that provision, it acted in a corporate management capacity and its action cannot be tested under the "arbitrary and capricious" standard of review. The only substantive review of the Plan that we may make is to assess its compliance with the policies underlying ERISA. In this case, neither the certification requirement nor its concomitant penalty violate ERISA's goals. Further, the Plan Administrator did not act in an arbitrary and capricious manner in refusing to waive the certification requirement here because Nazay could easily have complied with the Plan's procedures. The record indicates that the Plan Administrator has waived the requirement only where compliance was virtually impossible. Finally, the district court's prejudice rule is contrary to the language and spirit of ERISA, as well as settled caselaw. Moreover, even if the district court's rule were accepted, BSC would suffer prejudice if the requirement were not enforced.

Because there is no genuine issue of material fact, we will reverse the judgment of the district court of April 19, 1991, and will remand with directions that the court enter summary judgment in favor of appellants.