SYSTEM COUNCIL T–3 OF the INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, Robert W. Kenyon, Jorge Ferrin, Dyer Evans, John Sparacio, Joseph Martin, Thomas Spring, and Others Similarly Situated, Plaintiffs,

v.

AMERICAN TELEPHONE & TELEGRAPH COMPANY and AT & T Pension Plan, Defendants.

Civ. No. 93–329 (WGB).

United States District Court, D. New Jersey.

Oct. 24, 1995.

---

Paul M. Levinson, East Windsor, NJ, for Plaintiffs.

John H. Curley, Joseph V. Ippolito, Morristown, NJ, Marc E. Manly, Basking Ridge, NJ, for Defendants.

BASSLER, District Judge:

Both parties move for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). This Court's jurisdiction is pursuant to Section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a) and 28 U.S.C. §§ 1331 and 1337.

The parties do not dispute any material facts. Rather, they disagree as to whether certain employees of the American Telephone and Telegraph Company ("AT & T") were improperly denied benefits under the AT & T Pension Plan ("AT & T Plan"). Plaintiff's Complaint sets forth two principal causes of action. First, it seeks a determination under ERISA that the AT & T Plan administrators incorrectly rejected Plaintiffs' claims for commencement of pension benefits. Second, it claims that by refusing to provide Plaintiffs with a service pension, AT & T changed the AT & T Plan in violation of certain collective bargaining agreements and seeks to enforce those agreements under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185.

Because the Court's resolution of the ERISA claims moots the LMRA claims, the Court considers only Plaintiff's ERISA claims. Further, because Plaintiff Robert Kenyon is the only party fully to have exhausted his administrative remedies, the Court considers only his ERISA claims in this Opinion and Order. For the reasons discussed below, the Court **grants** summary judgment in favor of the Defendants as to Plaintiff Robert Kenyon's ERISA claims and dismisses the LMRA claims as moot.

## I. BACKGROUND

### A. The NCR Acquisition

In May 1991, AT & T acquired the NCR Corporation ("NCR"). (Joint Stipulation of Facts and Pertinent Portions of Relevant Documents at ¶ 14 ("Stipulation at ___")). NCR became, and still is, a wholly-owned subsidiary of AT & T within the controlled group of AT & T companies. (Stipulation at ¶ 14). As a result of the merger, AT & T and NCR consolidated their computer operations and a number of former AT & T employees began working for NCR. AT & T employees affected by the merger were given three options: (1) AT & T would assist them in securing employment with NCR; (2) AT & T would attempt to transfer employees who wished to remain with AT & T to other AT & T divisions; or (3) eligible AT & T employees who did not transfer to NCR or an AT & T affiliate could begin to receive their pension benefits under the AT & T Pension Plan ("AT & T Plan"). (Affidavit of Allen B. Miles at ¶ 5); *Communications Workers of America v. AT & T*, 828 F.Supp. 73 (D.D.C. 1993), *rev'd*, 40 F.3d 426 (D.C.Cir.1994). Approximately 500 AT & T employees began working for NCR after the merger. (Affidavit of Allen B. Miles at ¶ 6).

### B. The NCR–AT & T Interchange Agreement

On September 17, 1991, NCR executed an agreement to enter into an Interchange Agreement with AT & T (Stipulation at Exhibit E). The parties signed the NCR/AT & T Interchange Agreement on December 11, 1991, and it was made retroactively effective September 20, 1991. (Interchange Agreement, Stipulation at Exhibit F, at 6). The NCR/AT & T Interchange Agreement provides for the portability of pension service credit between the two companies, which means that upon retirement from NCR, former AT & T employees will be eligible to receive whatever AT & T benefits the employee earned at AT & T. *See Communications Workers of America v. AT & T*, 40 F.3d 426, 429 (D.C.Cir.1994). The NCR/AT & T Interchange Agreement prohibits former AT & T employees hired by NCR from receiving AT & T Plan benefits while employed by NCR. *Id.*

### C. The AT & T Plan Language

The parties' dispute centers on the interpretation of the various provisions of the AT & T Plan summarized below.

The AT & T Plan is qualified under Section 401 of the Internal Revenue Code, 26 U.S.C. § 401. In accordance with ERISA,

the AT & T Plan provides that employees who satisfy certain age and service requirements are eligible to receive service pensions from the AT & T Plan if they retire from active service from AT & T or its affiliates or subsidiaries. (AT & T Plan § 4, ¶ 1(a).[1]) The AT & T Plan further provides that a pension-eligible employee who leaves active service with one AT & T company to accept employment with another "Participating Company," or immediate reemployment by a company with which AT & T has an "Interchange Agreement,"[2] may not receive pension payments during the period of employment with that company.[3] *Id.; see* note 1. Section Eight, Paragraph 1 of the AT & T Plan provides: "Agreement may be made by the Company [AT & T] on behalf of all Participating Companies, with any Associated or Allied Company or any Former Affiliate for an interchange with that company of

1. Section 4, Paragraph 1(a) of the AT & T provides, in pertinent part:

 [A]ll employees [who have reached age and service eligibility requirements], shall, if they leave the service of a Participating Company for any reason other than transfer to another Participating Company or transfer to, or immediate (i.e., on the next business day) employment or re-employment by, a company with which the Participating Companies have an Interchange Agreement if the provisions of such Interchange Agreement are applicable to such employee, be retired from active service, and upon such retirement, shall be granted service pensions, provided that the minimum terms of employment referred to in this Paragraph 1(a) have been completed as of a date not later than the last day of the month in which the sixty-fifth birthday occurs.

2. Section 2 Paragraph 10 of the AT & T Plan defines "Interchange Agreement" as:

 "an agreement among one or more Participating Companies and one or more Former Associated or Allied Companies or Former Affiliates or one or more subsidiaries which are Participating Companies in a Qualified Pension Plan maintained by such a company, which provides for the portability of benefits and mutual recognition of term of employment with respect to certain employees who are employed by a Participating Company and were previously employed by a Former Associated or Allied Company or Former Affiliate or who are employed by a Former Associated or Allied Company or Former Affiliate and were previously employed by a Participating Company.

3. Section 4, Paragraph 6(a) of the AT & T Plan provides that "employment with any Participat-

the benefit obligations to which such company may be subject." The terms "Former Associated or Allied Company" and "Former Affiliate" are defined to mean certain former Bell system companies and their subsidiaries, but do not include NCR. (AT & T Plan at § 2, ¶ 2, 7.[4]) The term "Participating Company" is defined to include AT & T and its subsidiaries which decide to participate in the AT & T Plan, but does not expressly include NCR. (AT & T Plan at § 2, ¶ 16.[5]) Nowhere does the AT & T Plan define "Associated or Allied Company."

### D. *Plaintiff Robert Kenyon's Administrative Action*

Plaintiff Robert Kenyon ("Kenyon") was formerly employed by AT & T and is currently employed by NCR. (Stipulation at ¶ 4). He left the employ of AT & T on

ing Company or with any Interchange Company shall suspend the right of a retired employee, a person receiving a deferred vested pension, or a person otherwise entitled to receive a service or deferred vested pension, to pension payments during the period he continues in such employment."

4. Section 2, Paragraph 2 of the AT & T Plan defines "Former Associated or Allied Company" as follows:

 The words "Former Associated or Allied Company" shall mean either or both The Southern New England Telephone Company and Cincinnati Bell Inc.

 Section 2, Paragraph 7 of the AT & T Plan provides:

 The words "Former Affiliate" shall mean any or all of the following companies: NYNEX Corporation, Bell Atlantic Corporation, Bell-South Corporation, American Information Technologies Corporation, Southwestern Bell Corporation, US West, Inc., Pacific Telesis Group, Inc., any subsidiary of any such company (at any time both before and after January 1, 1984), which participates in a defined benefit pension plan maintained by any such company or maintains a comparable plan and with respect to which such company has an interchange agreement comparable to an Interchange Agreement as defined in Paragraph 10 of this Section 2, and Bell Communications Research, Inc.

5. "The words 'Participating Company' shall mean AT & T or any subsidiary of AT & T which shall have determined, with the concurrence of the Committee, to participate in the Plan." AT & T Plan at § 2, ¶ 16.

Friday, October 18, 1991 and was hired by NCR on Monday, October 21, 1991. (*Id.*). When he left AT & T, his service credit under the AT & T Plan was approximately thirty-one years and five months. (*Id.*). Kenyon applied for an AT & T pension on October 19, 1991 and was rejected. Kenyon appealed this decision to the Benefit Claim and Appeal Committee, and was again rejected. The AT & T Plan Employee Benefits Committee ("EBC"), the final review committee for claims arising under the AT & T Plan, considered Kenyon's claim twice, and twice rejected it. (Letters from Driscoll to Levinson of 1/13/93 and 2/24/95, Exhibits G–H of Stipulation).

Plaintiffs filed this action after the EBC rejected Kenyon's appeal. Because Kenyon has exhausted his administrative remedies and the administrative record is before this Court, the Court may properly consider Kenyon's ERISA claims. *See Communications Workers of America v. AT & T,* 40 F.3d 426 (D.C.Cir.1994) (holding that district court abused its discretion by considering ERISA claims before plaintiffs exhausted administrative remedies). Accordingly, the Court limits its decision to Kenyon's ERISA claims.

## II. *DISCUSSION*

### A. *Summary Judgment Standard*

◼ The standard for granting summary judgment pursuant to Federal Rule of Civil Procedure 56 is a stringent one. Summary judgment is appropriate only if all the probative materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Hersh v. Allen Prods, Co.,* 789 F.2d 230, 232 (3d Cir.1986); *Lang v. New York Life Ins. Co.,* 721 F.2d 118, 119 (3d Cir.1983). Significantly, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

◼ Whether a fact is material is determined by the applicable substantive law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. An issue involving a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1219 n. 3 (3d Cir.1988), *cert. denied,* 490 U.S. 1098, 109 S.Ct. 2449, 104 L.Ed.2d 1004 (1989).

◼ The moving party has the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Where the moving party satisfies this requirement, the burden shifts to the non-moving party to present evidence that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553. Once the moving party has carried its burden of establishing the absence of genuine issues of material fact, the non-moving party "may not rest upon mere allegations or denials" of its pleadings. Fed.R.Civ.P. 56(e). Rather, the non-moving party must produce sufficient evidence to reasonably support a jury verdict in its favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511, and not just "some metaphysical doubt as to material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

◼ In determining whether any genuine issues of material fact exist, the Court must resolve "all inferences, doubts, and issues of credibility ... against the moving party." *Meyer v. Riegel Products Corp.,* 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. dism'd.,* 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984) (*citing Smith v. Pittsburgh Gage & Supply Co.,* 464 F.2d 870, 874 (3d Cir.1972)).

### B. *Standard of Review Under Firestone*

◼ The parties dispute what standard of review the Court must apply to the EBC's decision. A denial of benefits challenged under Section 1132(a)(1)(B) is reviewed *de novo* by the Court, unless the benefit plan gives the administrator or fiduciary discretionary authority to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989). When a plan grants dis-

cretion to the plan administrators, their determination will be disturbed only if it is arbitrary and capricious, or constitutes an abuse of discretion. *Id.* at 111–12, 109 S.Ct. at 954–55; *Moats v. United Mine Workers of America,* 981 F.2d 685, 687 (3d Cir.1992) (reversing district court's holding that administrator's decision was arbitrary and capricious); *Nazay v. Miller,* 949 F.2d 1323, 1333–35 (3d Cir.1991); *Stoetzner v. U.S. Steel Corp.,* 897 F.2d 115, 119 (3d Cir.1990).

■ The AT & T Plan gives its administrators discretion in interpreting its terms. The AT & T Plan administrators are accorded "complete discretionary authority" to make final decisions concerning "all questions relating to eligibility" and "interpretation of all plan provisions." (AT & T Plan, § 3, ¶ 3(a)). Indeed, the District of Columbia Court of Appeals, interpreting the identical plan, concluded it vested its administrators with discretion and that the deferential standard of review in *Firestone* therefore applied. *See Communications Workers of America v. AT & T,* 40 F.3d 426, 433 (D.C.Cir.1994).

Plaintiffs argue unpersuasively that *Firestone*'s deferential standard of review applies only if the terms of the Plan give its administrators discretion to *disregard* the language of the Plan. Contrary to Plaintiffs' assertion, *Firestone* holds that the abuse of discretion standard applies when administrators are given discretion to *construe* the terms of the plan. The AT & T Plan gives the AT & T Plan discretion to make decisions regarding the "interpretation of all plan provisions," thus falling squarely within the discretionary standard in *Firestone.* Accordingly, the Court reviews the EBC determination under the deferential "arbitrary and capricious" standard.

■ A decision is "arbitrary and capricious" if it is not rational or based on consideration of the relevant factors. *Moats,* 981 F.2d at 687. In a case involving the interpretation of a provision of a pension plan, an administrator's decision should be upheld even if the court disagrees with it, so long as the interpretation is rationally related to a valid plan purpose and not contrary to the plain language of the plan. *Moats,* 981 F.2d at 688. To warrant reversal, the administrative decision must be "without reason, unsupported by substantial evidence [and] erroneous as a matter of law." *Abnathya v. Hoffman–La Roche, Inc.,* 2 F.3d 40, 45 (3d Cir.1993); *McPherson v. Employees' Pension Plan of American Re–Insurance Co.,* 33 F.3d 253 (3d Cir.1994).

The Court concludes, after examining the plain language of the AT & T Plan and in light of the valid plan purposes served by the administrators' interpretation, that the AT & T plan administrators did not abuse their discretion in determining that Plaintiffs were ineligible for benefits.

### C. *The Administrative Decision*

The EBC's February 24, 1995 decision sets forth in detail the reasons for denying Kenyon's benefits claim. The EBC withheld Kenyon's benefits pursuant to the provisions in Section 4, Paragraph 6(a) of the AT & T Plan, which provide for the suspension of benefits when a former AT & T employee resumes employment with an Interchange Company. (Letter from Byrnes to Levinson of 2/24/95 at 1).

To reach the conclusion that Section 4, Paragraph 6 of the AT & T Plan applied, the EBC first had to find that NCR was an Interchange Company. The EBC interpreted Section 2, Paragraph 11 to provide two definitions of an Interchange Company: first, as "a company other than a Participating Company, which is a party to an Interchange Agreement"; and, second, as a company "with respect to which such company has an interchange agreement comparable to an Interchange Agreement as defined in Paragraph 10 of this Section 2."[6] The EBC

---

**6.** Section 2, Section 11 provides:

The words "Interchange Company" shall mean a company, other than a Participating Company, which is a party to an Interchange Agreement and any subsidiary (which has been designated as an Interchange Company) of such company which participates in a defined benefit pension plan maintained by any such company or with respect to which such company has an interchange agreement comparable to an Interchange Agreement as defined in Paragraph 10 of this Section 2.

evaluated possible contrary interpretations of Section 2, Paragraph 11 before concluding that the Section provided two alternative requirements by which a company could qualify as an "Interchange Company." [7] (Letter from Byrnes to Levinson of 2/24/95 at 3 n. 3).

The EBC concluded that NCR was an Interchange Company under either of these definitions. By virtue of the Interchange Agreement between AT & T and NCR, the EBC determined that NCR was "a party to an Interchange Agreement." To reach this conclusion, the EBC first had to conclude that the AT & T/NCR Interchange Agreement was of a type permitted by the AT & T Plan. The EBC explained that Section 8, Paragraph 1 of the AT & T Plan authorizes AT & T to enter into Interchange Agreements with "any Associated or Allied Company," and that, in the absence of any definition in the AT & T Plan of the term "Associated or Allied Company," NCR, as a wholly-owned subsidiary of AT & T, fell within the ordinary meaning of the terms "associated" or "allied." Accordingly, the EBC found that NCR qualified as an Interchange Company under the AT & T Plan.

The EBC also found that NCR qualified as an Interchange Company under the alternate definition in Section 2, Paragraph 11. The EBC reasoned that the AT & T/NCR Interchange Agreement, which provides for the portability of benefits and mutual recognition of years of service, is comparable in material respects to an Interchange Agreement as defined in Section 2, Paragraph 10 of the AT & T Plan. On this basis as well, the EBC concluded that NCR qualified as an Inter-

change Company and denied Kenyon's appeal.

The EBC also pointed to prudential justifications for denying Kenyon's appeal. Allowing Kenyon to receive pension benefits while employed by NCR, the EBC maintained, would jeopardize the tax qualified status of the AT & T Plan to the substantial detriment of the AT & T Plan participants. (Letter from Byrnes to Levinson of 2/24/95 at 1–2).

Plaintiffs argue that the EBC's interpretation was erroneous for three reasons: (1) because NCR was not an Interchange Company within the meaning of the AT & T Plan; (2) because, as of October 18, 1991 and October 19, 1991, the date Plaintiffs terminated employment with AT & T, the AT & T/NCR Interchange Agreement was not in effect; and (3) because the EBC decision to suspend Plaintiffs' pension benefits materially altered the Plan to Plaintiffs' detriment.

Plaintiffs third argument is moot, because the Court determines that the EBC did not abuse its discretion in interpreting the AT & T Plan. Since the EBC properly interpreted the AT & T Plan to require the suspension of benefits, there was no "change" in the Plan. Accordingly, the Court addresses only Plaintiffs' first two arguments.

## E. The EBC's Determination that NCR is an "Interchange Company"

To conclude that the suspension provisions of Section 4 apply, the EBC had to determine that NCR and AT & T had an "Interchange Company." To conclude that NCR is an "Interchange Company," in turn, the EBC had to determine that NCR and AT & T had

---

7. In this respect, the EBC decision states:

As part of the committee's interpretation of Section 2, Paragraph 11, it evaluated possible contrary constructions of its terms. Specifically, it considered whether the "or" used in Line 6 provided for two requirements applicable to "any subsidiary" (Line 3), as opposed to two alternative requirements by which "a company" (Lines 1–2) could qualify as an "Interchange Company." The Committee rejected the former construction because, among other reasons, (1) Section 2, Paragraph 11 consistently uses the terms "such company" to refer back to "a company" that could be an "Interchange Company"; (2) if that construction were indeed intended, the grammar of the two

options would have been parallel (that is, the term "which" would have been used in Line 6 in place of the terms "with respect to which such company") but that same language is consistent with establishing two alternatives for qualifying as an Interchange Company; and (3) otherwise absurd results could occur (e.g., a "Former Affiliate" such as Bell Atlantic might be permitted to acquire NCR and, as a subsidiary of that company, NCR could participate in an Interchange Agreement with AT & T, but AT & T could not do the same with NCR as its own affiliate).

(Letter from Byrnes to Levinson of 2/24/95 at 3 n. 3).

an "Interchange Agreement." After retracing the EBC's steps through this interpretative process, the Court concludes that its decision to suspend Plaintiff Robert Kenyon's pension was not arbitrary and capricious.

■ The EBC's determination that NCR is an "Interchange Company" was not arbitrary and capricious. Plaintiffs argue that NCR was not an Interchange Company because the AT & T/NCR Interchange Agreement does not satisfy the requirements identified in Section 2, Paragraph 10 of the AT & T Plan. Specifically, Plaintiffs contend that NCR cannot be an Interchange Company because it is not a *"Former* Associated or Allied" company or a "Former Affiliate" as the Section 2, Paragraph 10 definition of "Interchange Agreement" requires. Plaintiffs argument fails, however, because it wrongly assumes that Section 2, Paragraph 10 defines the entire universe of possible interchange agreements that trigger the suspension provisions of Section 4. The EBC construed Section 8, Paragraph 1 to create a separate, and broader, category of interchange agreements capable of satisfying the AT & T Plan suspension provision. As opposed to the Section 2 Interchange Agreements, which limited the parties with whom AT & T could negotiate an interchange agreement to "Former Associated or Allied" companies, the EBC interpreted Section 8 to permit AT & T to enter into interchange agreements with "Associated or Allied" companies. Applying the ordinary meanings of the words "associated" and "allied," the EBC determined that AT & T's wholly-owned subsidiary NCR satisfied the definitional requirements of Section 8, Paragraph 1. The EBC's interpretation is supported by a tangible distinction between a former associated and allied company and an associated and allied company and, therefore, is not arbitrary or capricious.

The EBC rested its decision on the alternate basis that the NCR/AT & T Interchange Agreement was "comparable to" an Interchange Agreement as defined in Section 2, Paragraph 10 of the AT & T Plan. The Court does not find this conclusion to be arbitrary and capricious, either. The plain language of the AT & T Plan permits the interpretation that more than one type of "interchange agreement" may be created, or that the AT & T/NCR Interchange Agreement is comparable to an Interchange Agreement as defined in Section 2, Paragraph 10 of the Plan. In either case, NCR qualifies as an "Interchange Company" and the suspension provisions of Section 4 apply. The Court therefore does not find the EBC's decision to be arbitrary and capricious.

■ Plaintiffs further contend that the NCR/AT & T Interchange Agreement fails to satisfy the requirements of Section 8, Paragraph 1, which appears to require a interchange of "benefit obligations" between AT & T and an Associated or Allied Company. This argument fails because: (1) Section 8 of the AT & T Plan refers to both benefits and obligations, thus providing a textual basis for the EBC's determination that the AT & T/NCR Interchange Agreement satisfied the literal requirements of Section 8; and (2) even if Section 8, Paragraph 1 limits permissible interchange agreements to those that specifically exchange benefit obligations, the NCR/AT & T Interchange Agreement, which provides for the portability of benefits and mutual recognition of years of service, is still "comparable" to an Interchange Agreement as defined in Section 2, Paragraph 10.

The EBC determination also furthers the interests of the AT & T Plan and its participants. Indeed, a contrary interpretation could jeopardize the AT & T Plan's tax exempt status. *See* Rev.Rul. 56–693 1956 2 C.B. 282 (pension plan loses 401(a) status if it permits participants to withdraw funds prior to severance of employment); Rev.Rul. 74–254, 1974–1 CB 91, 92; Rev.Rul. 71–437, 1971–2 CB 185; Rev.Rul. 74–417, 1974–35 IRB 6; Rev.Rul. 73–533, 1973–2 CB 129; Rev.Rul. 60–281, 1960–2 CB 146, 147; IRS Gen.Couns.Mem. 39,824 (Aug. 15, 1990) (no severance when employee is reemployed by firm within a "controlled group" of companies); *Meckes v. Cina,* 75 A.D.2d 470, 429 N.Y.S.2d 936, 939 (4th Dept.1980), *aff'd,* 54 N.Y.2d 894, 444 N.Y.S.2d 918, 429 N.E.2d 425 (1981) ("a consideration of the tax consequences under the law appears to be a sound basis for determining whether or not a par-

ticular construction of a pension plan by its trustees is reasonable").

The EBC interpretation has the added benefit of deferring to common sense and forbidding those, like Kenyon, who continue to be employed by an AT & T subsidiary from simultaneously enjoying both the benefits of employment and the benefits of a pension. Preventing this type of "double-dipping," thus preserves AT & T Plan resources for true retirees and furthers the long-term, collective interests of the AT & T Plan and its participants.

 Plaintiffs argue that the EBC interpretation undermines the valid purposes of the AT & T Plan by denying them bargained-for contractual rights. *See Communications Workers of America v. AT & T,* 828 F.Supp. 73 at 77 (EBC interpretation "substantially change[s] the contractual landscape agreed upon" by AT & T and Plaintiffs). Plaintiffs' argument presupposes that the EBC determination is not only incorrect, but arbitrary and capricious as well. To begin with, the EBC interpretation is not arbitrary or capricious, as discussed above. Nor does the EBC interpretation somehow thwart Plaintiffs' bargained-for expectation interest. What Plaintiffs bargained for, and what they received, is an EBC vested with discretion to interpret a complexly-worded document that admits to different, equally plausible interpretations. That the EBC and Plaintiffs disagree as to which of these interpretations is correct does not make the EBC's interpretation arbitrary, or alter the parties' contractual relationship in any way.

The decision in *Communications Workers of America v. AT & T,* 828 F.Supp. 73 (D.D.C.1993), *rev'd,* 40 F.3d 426 (D.C.Cir. 1994), upon which Plaintiffs' rely, is not persuasive authority that the EBC's interpretation was arbitrary and capricious. The district court, interpreting the identical AT & T Plan, rejected the interpretation that the phrase "Associated or Allied Company" in Section 8 has a different, and broader, meaning than the term "Former Associated or Allied Term" used in Section 2. *Id.* at 74. NCR, the district court therefore reasoned, could not be an "Interchange Company," and the suspension provisions of Section 4 could

not apply. *Id.* The D.C. Circuit reversed, holding that the district court failed to apply the appropriate standard of review under *Firestone.*

Applying *Firestone,* this Court may overturn the EBC's interpretation only if it was arbitrary and capricious. Therefore, while Plaintiffs offer a plausible alternate interpretation, they fail to carry their heavy burden of demonstrating that the EBC interpretation was irrational. Because the EBC based its interpretation on a rational reading of the plain language of the AT & T Plan, and the interpretation further Plan policies, the Court finds that it was not arbitrary and capricious.

**F. The EBC's Determination that the AT & T/NCR Interchange Agreement was Effective on October 19, 1991**

 Plaintiffs argue that Kenyon's pension should not have been suspended because the NCR/AT & T Interchange Agreement was not finalized until December 11, 1991, or a month and a half after Kenyon began working for NCR. Plaintiffs further contend that the less formal interchange agreement that the parties entered into on September 18, 1991 cannot satisfy the Section 4 suspension requirements because "no rational reading of the phrase Interchange Agreement in the Plan can include an interchange letter of intent' for purposes of the suspension provisions of Section 4." (Plaintiffs' Brief in Opposition to Defendant's Motion for Summary Judgment at 18).

The September 18, 1991 agreement is an "interchange agreement" as the term is used in Section 4 of the AT & T Plan. The September 18, 1991 agreement manifests an intention by the parties to be bound by the agreement. (*See* Letter from Russ to McElwain of September 17, 1991, attached as Exhibit E to Stipulation, at 1) ("AT & T would like NCR's concurrence now to finalize the substance of this letter in a formal Interchange Agreement after the closing"). The September 18, 1991 agreement was therefore binding and enforceable. *See* Restatement (Second) of Contracts § 27 (1981) ("Manifestations of assent that are in themselves suffi-

cient to conclude a contract will not be prevented from so operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof. . . ."); *Melo–Sonics Corp. v. Cropp,* 342 F.2d 856, 859–60 (3d Cir.1965) ("the formalization of the contract was merely putting into writing that which had already been agreed upon . . . by the parties"). The September 18, 1991 agreement provided for mutual recognition of service credit, among other things. The EBC, therefore, was not irrational in concluding that the September 18, 1991 agreement was an "Interchange Agreement" and that the suspension provisions of Section 4 applied.

Furthermore, the NCR/AT & T Interchange Agreement itself provides that it is retroactively effective as of September 20, 1991. Plaintiffs suggest no reason why parties cannot contract for retroactive effect, especially where, as here, potentially adverse tax consequences attach in the absence of a retroactive effective date. *See* Rev.Rul. 56–693 1956 2 C.B. 282 (pension plan loses 401(a) status if it permits participants to withdraw funds prior to severance of employment); IRS Gen.Couns.Mem. 39,824 (Aug. 15, 1990) (no severance when employee is reemployed by firm within a "controlled group" of companies). Accordingly, the EBC's determination that the NCR/AT & T Interchange Agreement was effective as of September 20, 1991 was not arbitrary and capricious either.

## III. *CONCLUSION*

It is not the Court's function under *Firestone*'s deferential standard of review to impose Plaintiffs' preferred interpretation of the Plan. Because the EBC's interpretation is consistent with the language of the Plan and furthers plan policies, the Court finds that its decision to suspend Mr. Kenyon's benefits was not arbitrary and capricious. Accordingly, the Court grants summary judgment in favor of Defendants as to Counts Three, Four and Six of Plaintiffs' Complaint insofar as they pertain to Plaintiff Robert Kenyon, dismisses the remainder of Counts Three, Four and Six of Plaintiffs' Complaint, because Plaintiffs have not exhausted administrative remedies, denies Plaintiffs' cross-motion for summary judgment, and dismisses Counts One, Two and Five of Plaintiffs' Complaint as moot.

An appropriate Order accompanies this Opinion.

### *JUDGMENT ORDER*

This matter having come before the Court on Defendants' motion for summary judgment; and

The Court having considered the submissions of counsel on behalf of the parties; and

For good cause shown;

It is on this 24th day of October, 1995 ORDERED that:

(1) summary judgment is **granted** in favor of Defendants as to Counts Three, Four and Six of Plaintiffs' Complaint insofar as they pertain to Plaintiff Robert Kenyon;

(2) the remainder of Counts Three, Four and Six of Plaintiffs' Complaint are **dismissed** for failure to exhaust administrative remedies;

(3) Plaintiffs' cross-motion for summary judgment is **denied;** and

(4) Counts One, Two and Five of Plaintiffs' Complaint are **dismissed as moot.**